**TOWN OF SMITHFIELD**

v.

**CHURCHILL & BANKS COMPANIES, LLC, et al.**

**No. 2005–66–M.P.**

Supreme Court of Rhode Island.

June 22, 2007.

when it is grounded, as it so often is, in the more tangible confines of the construction world; it is all the more ephemeral when measured in documents and diagrams rather than bricks and mortar. The developer in this case was required to assemble and submit various plans and documentation to the Town of Smithfield Zoning Board of Review (zoning board). While the Churchill & Banks application was pending, the General Assembly imposed a moratorium on the use of comprehensive permit applications by private, for-profit developers such as Churchill & Banks. Only those applications deemed by SHAB to be substantially complete as of February 13, 2004, were allowed to proceed. SHAB made such a determination with respect to the Churchill & Banks application. Upon our inspection, however, we conclude that SHAB's decision was fatally undermined by error of law. For the reasons set forth in this opinion, we reverse the decision of SHAB.

Timothy Kane, Esq., Greenville, for Town of Smithfield.

Raymond A. Marcaccio, Esq., Providence, for Churchill Banks.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

We issued a writ of certiorari to review the State Housing Appeals Board's (SHAB) decision that the application for a comprehensive permit submitted by Churchill & Banks Companies, LLC (Churchill & Banks) under the Low and Moderate Income Housing Act, G.L.1956 chapter 53 of title 45, was, as of February 13, 2004, substantially complete by the terms of § 45–53–6(f)(1). "Substantial completeness" is an elusive standard even

### Facts and Procedural History

On June 3, 2003, the Smithfield Town Council denied a petition for a zone change that Churchill & Banks had filed in hopes of constructing 336 apartment units on 28 acres near the intersection of Routes 44 and 295 in Smithfield. Undeterred, Churchill & Banks retooled its submission, designated 25 percent of the units as affordable housing, and filed an application for a comprehensive permit with the zoning board on July 22, 2003, seeking leave to construct the same number of units on the identical parcel, but this time under the "fast track" approval process § 45–53–4, as amended by P.L.2002, ch. 416, § 1 reserved for qualified applicants.[1] Al-

---

1. A 2002 amendment to G.L.1956 § 45–53–4 allowed private, for-profit developers to take advantage of the "one stop shopping" provisions that had previously been reserved for public agencies, limited equity housing cooperatives and nonprofit developers. *See* P.L. 2002, ch. 416, § 1. As amended, § 45–53–4 permitted companies such as Churchill &

though § 45–53–4 required the zoning board to convene a hearing on any affordable housing applications within thirty days of submission, the parties agreed to begin hearings on the Churchill & Banks application on October 8, 2003.[2]

In the autumn of 2003, Churchill & Banks was one of five developers seeking expedited approval for five separate projects in the Town of Smithfield (town) under § 45–53–4. The potential cumulative impact of these proposed developments on the future of Smithfield was significant, to say the least—more than 1,000 new residential units reportedly were in the offing. Hearings on the Churchill & Banks application continued apace through the end of the year and into early 2004, until the General Assembly, in response to the deluge of applications for new developments under § 45–53–4, enacted § 45–53–4(b)(1) to impose a temporary moratorium on such applications by for-profit developers. P.L.2004, ch. 3, § 1.

The zoning board had scheduled a meeting that was to be devoted exclusively to the Churchill & Banks application on February 11, 2004, but because the General Assembly had approved the moratorium on February 5, 2004, the zoning board instead chose to use that meeting to focus on the impact the moratorium would have on the application. Churchill & Banks averred that because of expenditures it had made in reliance on the zoning board's continued advancement of its application, the moratorium should not apply in its case. Unbeknownst to both Churchill & Banks and the zoning board at the time, however, although the General Assembly had passed the moratorium legislation on February 5, 2004, the public law was not, in fact, enacted until February 13, 2004.[3] See § 45–53–4(b)(1) and (d). Regardless, the zoning board did not hear testimony from any of the four experts that Churchill & Banks had brought to speak at the meeting. After the February 11 meeting, the zoning board next convened on March 10, 2004, at which time the Smithfield solicitor expressed his view that the moratorium did apply to Churchill & Banks. As a result, the zoning board tabled the further consideration of the Churchill & Banks application until after the moratorium was set to expire, on January 31, 2005.

Churchill & Banks filed an appeal with SHAB, asserting that under the terms set out in § 45–53–6(f)(1) its application was substantially complete before February 13, 2004. Under § 45–53–6(f)(2), SHAB has the power to remand applications it deems substantially complete for continued hearings at the local zoning board level. SHAB considered memoranda and heard oral arguments from the parties on appeal, and it ruled that Churchill & Banks's application was substantially complete as of February 13, 2004. SHAB also held that the zoning board had acted in a manner demonstrating that it considered Churchill

Banks to file a single, comprehensive permit application with a municipality's zoning board. See § 45–53–4, as amended by P.L. 2002, ch. 416, § 1. Previously, such companies would have to file multiple applications with any number of local boards of review.

**2.** Under § 45–53–4, if a local zoning board failed to convene a meeting to review an affordable-housing application within thirty days of its submission, that application was deemed to be allowed and immediate approval was to follow. The parties, however, could agree to extend that window of time; Churchill & Banks and the zoning board did just that in this case.

**3.** The Governor did not sign either one of the two identical moratorium bills that the House and Senate passed on February 5, 2004, and so in accordance with article 9, section 14, of the Rhode Island Constitution, those bills did not become operative until February 13, 2004.

& Banks's application to be substantially complete. SHAB remanded the Churchill & Banks application to the zoning board on December 29, 2004. Under § 45–53–6(f)(2), the zoning board was obligated to consider Churchill & Banks's remanded application under the pre-moratorium version of the Low and Moderate Income Housing Act. The town appealed SHAB's decision to this Court, and also filed a comprehensive petition for a writ of certiorari that extended to SHAB's rulings on the Churchill & Banks application as well as similar applications from Smithfield Hills, LLC and Crown Properties, LLC.[4]

On April 19, 2005, in an order granting the petition for writ of certiorari, this Court stayed SHAB's remand orders and returned the administrative records to SHAB "so that appropriate findings and conclusions supporting the ruling can be made."

On remand, a reconstituted SHAB conducted a *de novo* hearing on the Churchill & Banks application's substantial completeness under § 45–53–6(f)(1)(i) and the town's conduct under § 45–53–6(f)(1)(ii). With regard to substantial completeness, the town alleged that Churchill & Banks's application was deficient in six of the ten areas set forth in § 45–53–6(f)(1)(i)(A) through (J). But, before delving into each factor, the SHAB decision specifically found that Churchill & Banks had been prepared to continue with its evidentiary presentation at the zoning board hearing on February 11, 2004, and that the board denied it the opportunity to do so. Although both parties acknowledge that as of February 11, 2004 *both* the zoning board and Churchill & Banks mistakenly believed that the moratorium *already* was in effect at that time, SHAB nevertheless

ruled that Churchill & Banks "should not be penalized here for the omission of any information that it was ready to present to the Zoning Board before the moratorium took effect."

On November 14, 2005, SHAB issued a twenty-six page decision, ruling that Churchill & Banks's application was substantially complete as of the February 13, 2004 moratorium date. SHAB also reiterated its previous holding that the zoning board had treated the application as if it were substantially complete.

On April 3, 2006, this Court ruled in *New Harbor Village, LLC v. New Shoreham Zoning Board of Review*, 894 A.2d 901, 909 (R.I.2006), that there is no right of appeal to this Court from an adverse ruling by SHAB on the substantial completeness of an application submitted under § 45–53–4. As a result, we denied the town's appeal in an order dated May 23, 2006, but assigned the case to the "show cause" calendar for October 30, 2006, to hear oral arguments on the two issues preserved for our review by virtue of our earlier grant of certiorari: (1) whether SHAB had jurisdiction, and (2) whether SHAB had erred in finding the application substantially complete.

This Court determined that the parties had raised issues that required further consideration, and in an order dated November 21, 2006, we assigned the case to the continuous argument calendar for full briefing and argument. In addition to the issues the petitioner had raised, the order instructed the parties to address three specific issues: (1) Whether SHAB's consideration of information that Churchill & Banks was prepared to submit into the record on or before the February 13, 2004

---

4. The petition, insofar as it pertained to Crown Properties, LLC, was dismissed on March 9, 2006. The petition, insofar as it pertained to Smithfield Hills, LLC, was dismissed on October 11, 2006.

moratorium, but was denied the opportunity to do so, constitutes an error of law; (2) If SHAB impermissibly considered such information, whether sufficient evidence was submitted to the zoning board on or before February 13, 2004, to sustain SHAB's finding of substantial completeness; (3) Whether there was sufficient evidence in the record to support SHAB's finding that the zoning board acted in a manner demonstrating that it considered the application substantially complete based on § 45–53–6(f)(1)(ii). Having reviewed the parties' latest written and oral submissions, we now examine these contested issues.

### Standard of Review

■ ■ ■ "This Court employs a deferential standard when reviewing a SHAB decision * * *. * * * 'A SHAB decision may be reversed by this Court if it violates constitutional or statutory provisions, was made in excess of statutory authority or upon error of law, or was otherwise clearly erroneous in view of the evidence or was otherwise arbitrary or capricious.'" *West*

*Reservoir, LLC v. Smithfield Zoning Board of Review,* 884 A.2d 977, 978 (R.I. 2005) (mem.) (quoting *Coventry Zoning Board of Review v. Omni Development Corp.,* 814 A.2d 889, 898 (R.I.2003)). And because we review this case under writ of certiorari, we also are mindful that "[o]n certiorari, this Court must 'scrutinize the record as a whole to determine whether legally competent evidence exists to support the findings of the court below.'" *Mill Realty Associates v. Crowe,* 841 A.2d 668, 672 (R.I.2004) (quoting *Caswell v. George Sherman Sand & Gravel Co.,* 424 A.2d 646, 648 (R.I.1981)).

### Discussion

**I. Was Churchill & Banks's application substantially complete?**

Section 45–53–6(f)(1)(i)(A) through (J) provides SHAB with ten criteria to guide its assessment of whether comprehensive permit applications that were in process when the February 13, 2004 moratorium took effect were substantially complete at that time.[5] What it does not provide, un-

---

**5.** Section 45–53–6(f)(1)(i)(A) through (J) reads in part as follows:

"(f) The state housing appeals board shall:

"(1) * * *

"(i) The determination of substantial completeness shall be based on whether there was on or before February 13, 2004, substantial completeness of substantially all of the following:

"(A) A written request to the zoning board of review to submit a single application to build or rehabilitate low or moderate income housing in lieu of separate applications to the application local boards;

"(B) A written list of variances, special use permits and waivers requested to local requirements and regulations, including local codes, ordinances, by-laws or regulations, including any requested waivers from the land development or subdivisions regulations, and a proposed timetable for completion of the project;

"(C) Evidence of site control;

"(D) Evidence of eligibility for a state or federal government subsidy, including a letter from the funding agency indicating the applicant and the project;

"(E) Site development plans showing the locations and outlines of proposed buildings; the proposed location, general dimensions and materials for street, drives, parking areas, walks and paved areas; proposed landscaping improvements and open areas within the site; and the proposed location and types of sewage, drainage and water facilities;

"(F) A report on existing site conditions and a summary of conditions in the surrounding areas, showing the location and nature of existing buildings, existing street elevations, traffic patterns and character of open areas, including wetlands and flood plains, in the neighborhood;

"(G) A tabulation of proposed buildings by type, size (number of bedrooms, floor area) and ground coverage and a summary showing the percentage of the tract to be

fortunately, is a useful definition of "substantially complete." The pragmatic checklist in § 45–53–6(f)(1)(i)(A) through (J) establishes a seemingly precise scorecard that, at first glance, would appear to reduce SHAB's evaluations to a rote exercise in inventory accounting, but the lack of a satisfactory explication of the determinative standard undermines the objectivity of the process.

Under § 45–53–6(f)(1)(i), SHAB's determination of an application's substantial completeness "shall be based on whether there was on or before February 13, 2004, substantial completeness of substantially all of" the ten elements the statute then proceeds to list. Such circular language renders the statute susceptible to any number of potential interpretations, including those suggested by Churchill & Banks in this case. For example, one logically could argue that by substantially completing some majority of the ten requirements, but completing none of them, an applicant could attain substantial completeness under § 45–53–6(f)(1)(i) as it is written. Conversely, one could argue that an application that substantially completed nine of the criteria, but totally ignored one, would not qualify as substantially complete. Of course, the resolution of such ambiguity in these instances typically is the province of the agency responsible for carrying out the statute's mandate—subject to review by the courts. *See In re Lallo,* 768 A.2d 921, 926 (R.I.2001).

In this case, SHAB made a *finding of* substantial completeness based on its determination that Churchill & Banks's application was substantially complete with respect to all ten benchmarks spelled out in § 45–53–6(f)(1)(i)(A) through (J). In its evaluation of Churchill & Banks's application, however, SHAB did not endeavor to specifically quantify what constitutes "substantial completeness" with regard to those benchmarks, collectively or individually. Rather, a review of the transcript of SHAB's deliberations indicates that for all practical purposes, the SHAB members' view of substantial completeness mirrored the late Supreme Court Justice Potter Stewart's oft-quoted take on obscenity: "I know it when I see it."[6] The members appropriately drew on their professional backgrounds in re-evaluating the five criteria on which the zoning board alleged Churchill & Banks's application fell short of that mark, and their factual findings *merit deference from this Court. See City of East Providence v. Public Utilities Commission,* 566 A.2d 1305, 1307 (R.I. 1989). However, to the extent that SHAB's ultimate decision turned, as it clearly did, on an interpretation of § 45–53–6(f)(1)(i), that statutory interpretation is subject to *de novo* review before this Court. *City of East Providence,* 566 A.2d at 1307.

Although § 45–53–6(f)(1)(i) fails (or, perhaps more accurately, does not even attempt) to define "substantial com-

occupied by buildings, by parking and other paved vehicular areas and by open spaces;

"(H) A master plan, if the development proposal is for a major or minor land development plan or a major or minor subdivision;

"(I) [A] sample land lease or deed restrictions with affordability liens that will restrict use as low and moderate income housing units for a period of not less than thirty (30) years; and

"(J) The list of all persons entitled to notice in accordance with § 45–24–53."

6. Potter Stewart, Associate Justice of the United States Supreme Court from 1958 to 1981, penned this famously commonsensical take on pornography in his concurring opinion in the landmark free speech case, *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).

pleteness" in any meaningful way, it does succeed in unequivocally establishing that information that was not included in an application prior to February 13, 2004, is excluded from SHAB's review. Yet, in spite of this clear and unambiguous deadline, SHAB determined that it would not penalize Churchill & Banks "for the omission of any information that it was ready to present to the Zoning Board before the moratorium took effect." SHAB's rationale for this decision—that the zoning board should not be allowed to assail Churchill & Banks's application for omissions that might have been addressed but for the board's management of the February 11, 2004 meeting—arose from its factual findings, to be sure. But these factual findings wandered beyond the narrow scope of review authorized by § 45–53–6(f)(1)(i), and as such they emanate from an error of law. There is no ambiguity in the controlling statutory provision here, and "[i]t is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Moore v. Ballard*, 914 A.2d 487, 490 (R.I. 2007) (quoting *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1226 (R.I.1996)). SHAB's mandate was to review the application as it stood on February 13, 2004, not to speculate about what it *might* have been, or even *should* have been at that time.

Churchill & Banks has pointed out that SHAB regulations permit it to consider "additional evidence," but the rule to which Churchill & Banks alludes, Regulation 9.02, specifically applies to appeals from denials of comprehensive permit applications or approvals that carry conditions the appellant deems infeasible. *See* § 45–53–5. It is noteworthy, as well, that SHAB's ruling that Churchill & Banks "should not be penalized * * * for the omission of any

information that it was ready to present to the Zoning Board before the moratorium took effect" made no mention whatsoever of Regulation 9.02. Moreover, even if SHAB's regulation did extend to "substantial completeness" appeals, the general provisions of a legislative rule must give way to specific statutory language, so the February 13, 2004 deadline contained in § 45–53–6(f)(1)(i) would trump any self-ordained right SHAB might assert to look beyond the record that was before the zoning board in this instance. *See Little v. Conflict of Interest Commission*, 121 R.I. 232, 236, 397 A.2d 884, 886 (1979).

Churchill & Banks also contends that SHAB did not actually consider any information that was not part of its application as of February 13, 2004. Rather, Churchill & Banks postulates, SHAB merely considered its lost opportunity to present additional evidence. Assuming, *arguendo*, that this Court accepted that premise, we still would reckon it to be a distinction without a difference. During its deliberations, SHAB voted to approve a motion accepting "the offer of proof submitted on behalf of Churchill & Banks to be considered as part of the record." At the February 11, 2004 zoning board hearing, Churchill & Banks had requested that the record reflect that it was prepared to present the testimony of four different professionals, each of whom would have spoken to some aspect of its application. Significantly, however, no documents were submitted or marked as exhibits. This Court need not speculate about whether the SHAB members fully (or uniformly) understood the import of an offer of proof in the context of appellate review to conclude that neither offers of proof, nor affidavits of witnesses who might have testified, nor lost opportunities can overcome the clear and unambiguous language of § 45–53–6(f)(1)(i).

The zoning board decided to use its February 11, 2004 meeting to conduct an inquiry into the consequences of a moratorium that both the board and Churchill & Banks believed already was in effect at that time. Although this legitimate choice to table further consideration of Churchill & Banks's application ended up costing Churchill & Banks the opportunity to offer additional testimony before what the parties later discovered was a moratorium effective February 13, 2004, that moratorium became effective almost seven months after Churchill & Banks first submitted its application. Section 45–53–6(f)(1)(i) does not provide for the consideration of any evidence that was not part of a developer's application before the moratorium; nor does it provide an exception for any "lost opportunities." Regardless of how SHAB's decision to accept Churchill & Banks's "offer of proof" factored into its overall analysis of Churchill & Banks's application, that decision constituted an error of law that cannot be cured retrospectively by semantic distinctions.

Although Churchill & Banks disputes that SHAB considered any of the additional proffered evidence in making its decision, it is clear from the dialogue among SHAB members during their review of Churchill & Banks's application, and in some cases in the wording of the motions on which they actually voted, that at the very least SHAB's vote to accept Churchill & Banks's offer of proof colored to some extent SHAB's votes on two of the five "substantial completeness" criteria that were under dispute.[7]

In considering whether Churchill & Banks had provided adequate site development plans as required by § 45–53–6(f)(1)(i)(E), SHAB members unanimously approved a motion that Churchill & Banks "has supplied sufficient information *and would have supplied further information given the opportunity to satisfy the requirement that there was substantial enough information that the zoning board in the Town of Smithfield would act on the petition.*" Further, SHAB's written decision notes that it "has given due consideration to the fact that Churchill & Banks was declined the opportunity to present additional evidence on February 11, 2004." Although the decision does express the view that the zoning board had "more than ample information to proceed with a meaningful review" of the application, it follows that pronouncement with a curious caveat that would seem to undercut a finding of substantial completeness: "To the extent that the Zoning Board believes that a particular detail may need clarification or supplementation, it may request that Churchill & Banks provide such information during the course of the evidentiary hearings on remand." The question before SHAB was whether the Churchill & Banks application had been substantially complete as of February 13, 2004, so reassurances that the zoning board would be allowed to ask for additional information on remand were beside the point. Just as it is clear from the plain language of § 45–53–6(f)(1)(i) that applications had to be substantially complete by February 13, 2004 to proceed under the pre-moratorium approval process, it is clear from the plain language of SHAB's decision that SHAB's acceptance of Churchill & Banks's offer of proof impermissibly influenced SHAB's analysis of Churchill & Banks's site development plans.

---

7. SHAB voted that Churchill & Banks had submitted a substantially complete list of "variances, special use permits and waivers requested to local requirements and regulations" in accordance with § 45–53–6(f)(1)(i)(B) *before* it discussed and voted to include Churchill & Banks's offer of proof in its deliberations.

SHAB's review of Churchill & Banks's report on existing site conditions, required under § 45–53–6(f)(1)(i)(F), recycles the same perplexing proclamations on "meaningful review" and "supplementation" that diluted the persuasive force of its endorsement of Churchill & Banks's site development plans. And, after observing that Churchill & Banks had indicated that "it intended to provide additional information regarding existing site conditions during the February 11, 2004 hearing," the SHAB decision again acknowledges that it has "given due consideration" to that lost opportunity. SHAB also admits that the panel actually neglected to vote on the sufficiency of Churchill & Banks's report on existing site conditions, a procedural misstep that certainly raises questions about the findings of fact on this particular point. But we need not question SHAB's findings of fact because again in this instance it is clear that SHAB's review of the site conditions report incorporated to some extent a consideration of extraneous factors beyond the black-and-white application that was frozen in time on February 13, 2004, by operation of the moratorium.

Although we conclude that SHAB's consideration of information that might have been submitted before February 13, 2004 (*i.e.,* Churchill & Banks's "lost opportunity"), was erroneous, it was at least understandable. We are hard-pressed, however, to fathom the complete disregard of the plain language of a statutory provision. Section 45–53–6(f)(1)(i)(H) requires "[a] master plan, if the development proposal is for a major or minor land development plan or a major or minor subdivision[.]" Both parties acknowledge that § 45–53–

6(f)(1)(i)(H) applies to Churchill & Banks's application, and both parties agree that as of February 13, 2004, Churchill & Banks's application contained no discrete document either labeled as a master plan or that could reasonably be said to fit that description. In spite of this glaring omission, SHAB found that Churchill & Banks had submitted a substantially complete master plan. The transcript of SHAB's October 17, 2005 meeting sheds some light on exactly how that happened:

"CHAIRWOMAN SHEKARCHI: Moving to the fourth issue in dispute, the master plan submission, whether or not that was substantially complete.

"MR. GOODRICH: I take the position, *I don't think they need it.* I certainly think based upon all our other findings that there was adequate information, whether it be a planning board or zoning board, could understand what was being attempted by this applicant. I think there was enough specificity of detail that would enable the master plan submission. I make that in the form of a motion." (Emphasis added.)

Section 45–53–6(f)(1)(i)(H) unequivocally requires a master plan, and SHAB's own regulations echo that mandate.[8] For its part, the town points to Section IV, Article B of the Smithfield Land Development and Subdivision Review Regulations, which sets forth very specific requirements as to what constitutes a valid master plan. SHAB seemingly chose to search the entire application to amalgamate some reasonable facsimile of a master plan, and even at that its ultimate finding of substantial completeness stands in stark contrast to the list of notable omissions cited in its own December 2004 staff report.[9]

8. Among the "minimum" requirements necessary to constitute a "completed application for a comprehensive permit" under SHAB Regulation 8.01, subsection 8.01(ii)(j) calls for "a master plan, if the development proposal is

for a major or minor land development plan or a major or minor subdivision[.]"

9. SHAB's staff report reviewed Churchill & Banks's application in light of the master plan

The SHAB decision refers to the town's regulations, as well as the statutory definition of master plan provided in G.L.1956 § 45–23–32(23),[10] but it is entirely bereft of any factual findings. In lieu of factual findings, SHAB offers the conclusory observation that "the administrative record, when reviewed in its entirety, contains more than ample information to qualify as a substantially complete master plan level submission * * *." Ironically, SHAB's decision chides the zoning board for failing to identify a single omission from its local filing requirements. This reproach strikes us as gratuitous in light of two facts: (1) SHAB's own staff report identified several omissions; and (2) the zoning board argued that Churchill & Banks had *completely failed* to submit a master plan—to this Court, that contention seems to sufficiently identify a rather gaping omission.

Ignoring the plain language of a statute is perhaps the ultimate error of law, and SHAB's ruling that Churchill & Banks's application included a substantially complete master plan arose from a disregard for the plain language of § 45–53–6(f)(1)(i)(H). And although SHAB's consideration of information beyond the application documents that were on file with the zoning board as of February 13, 2004 was perhaps an understandable misinterpretation of § 45–53–6(f)(1)(i), that, too, was an error of law.

In imposing the moratorium, the General Assembly expressly declared that towns throughout Rhode Island were "confronted by an unprecedented volume and complexity of development applications" by private for-profit developers, and that "in order to protect the public health and welfare in communities" a temporary respite was necessary "to provide sufficient time to establish a reasonable and orderly process for the consideration of applications." Section 45–53–4(b)(1). This clear statement of statutory purpose underscores the significance of the February 13, 2004 deadline. As we conclude that SHAB's findings were infected by error of law, we reverse its ruling that Churchill and Banks's application was substantially complete under § 45–53–6(f)(1)(i).

## II. Did the zoning board treat Churchill & Banks's application as if it were substantially complete?

Under § 45–53–6(f)(1)(ii), if the zoning board "acted in a manner demonstrating that it considered the application substantially complete for the purposes of reviewing the application, the State Housing Appeals Board shall consider the application substantially complete." SHAB's determination that the zoning board treated Churchill & Banks's application as if it were substantially complete is entitled to deference from this Court, but only to the extent that our review of the record uncovers " 'legally competent evidence' " to support that ruling. *Mill Realty Associates*, 841 A.2d at 672. We previously have de-

---

requirements identified in Section IV, Article B of the Smithfield Land Development and Subdivision Regulations, and found it to be wanting in the following respects: existing utilities/drainage; location of wetlands and watercourses present or within 200 feet of property, verified by DEM; areas of steep slope, ledge and poorly drained areas within the tract as well as within 200 feet; delineation of all land that is undevelopable due to slope, soil or water constraints.

10. General Laws 1956 § 45–23–32(23) defines a master plan as follows:

"An overall plan for a proposed project site outlining general, rather than detailed, development intentions. It describes the basic parameters of a major development proposal, rather than giving full engineering details. Required in major land development or major subdivision review. *See* § 45–23–40."

fined legally competent evidence as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance." *Foster–Glocester Regional School Committee v. Board of Review,* 854 A.2d 1008, 1012 (R.I.2004) (quoting *Rhode Island Temps, Inc. v. Department of Labor and Training, Board of Review,* 749 A.2d 1121, 1125 (R.I.2000)). The SHAB decision laments the lack of a "bright line" standard to facilitate its evaluation of the zoning board's conduct in this case. With no clear legal signposts to guide it, SHAB fell back on what it characterized as "a 'common sense' review of the nature and extent of the Zoning Board's proceedings." Although that choice was not a *per se* error of law, SHAB admittedly was venturing into uncharted waters; to the extent that its compass was calibrated on common sense rather than legal precedent, we probe the resulting legal conclusion somewhat more assiduously.

■ There was minimal discussion, no fact-finding and no debate—common sense, legal, or otherwise—over the evidence at issue before SHAB voted unanimously that the zoning board had treated Churchill & Banks's application as if it were substantially complete. The following excerpt from the October 17, 2005 meeting reflects the dialogue on this point in its entirety:

"CHAIRWOMAN SHEKARCHI: * * * The last issue is whether or not the zoning board acted in a manner determining whether the application was substantially complete, deemed to be substantially complete.

"MR. MAYNARD: Similar to the previous case, the activity that took place is sufficient to make this application substantially complete.

"MR. GOODRICH: I second that for the same reasons that the board acted previously and would lead the applicant to believe his project was being heard in an orderly manner.

"MS. MAXWELL: Motion that Churchill & Banks' application, that the Smithfield Zoning Board acted in a manner that the applicant could deem that his application was substantially complete."

The previous case before SHAB had involved the Smithfield zoning board and another developer, but in that case SHAB had based its decision that the zoning board had treated the application as substantially complete on "the number of hearings stated in the record" and the fact that the developer had "represented that they only had one more remaining witness, that they had essentially completed their case and they were prepared to rest after that witness." In Churchill & Banks's case, when the moratorium took effect, the developer had at least four more witnesses to present, had stated on the record that it may need to request more variances in the future, and had yet to submit a master plan. By implication then, the mere number of hearings that were held on Churchill & Banks's application carried significant evidentiary weight in SHAB's deliberations over whether the zoning board had treated Churchill & Banks's application as if it were substantially complete.

SHAB's written decision provides some additional insight into the evidence that swayed its vote under § 45–53–6(f)(1)(ii). SHAB notes that the zoning board never certified Churchill & Banks's application as incomplete, and that it also "did not ever cease the proceedings because of any concerns that the Application was purportedly incomplete." In summary, then, SHAB based its decision on the fact that the zoning board had held two hearings on Churchill & Banks's application, and had

neither overtly certified the application as incomplete nor halted the hearings because of any deficiencies in the application.

Examining the issue of the hearings first, we view with some skepticism the notion that by conducting two hearings and scheduling a third over the course of seven months the zoning board's actions constituted conclusive evidence that it considered Churchill & Banks's application to be substantially complete. When Churchill & Banks submitted its application in July 2003, the zoning board confronted something of a Hobson's choice.[11] As autumn approached, Smithfield faced the prospect of juggling five comprehensive permit applications for a reported total of more than 1,000 units, and each one was entitled to expedited review under § 45-53-4. Section 45-53-4, as amended by P.L.2002, ch. 416, § 1, required the zoning board to begin hearings on each application within thirty days of its submission. If the zoning board delayed hearings, any of the developers could have appealed to SHAB, and at that point SHAB would have had the power to usurp the zoning board's control over the review process and approve the comprehensive permits by itself. See §§ 45-53-5; 45-53-6(d) both enacted by P.L.1991, ch. 154, § 1; SHAB Regulation 2.08(ii). Faced with the risk of completely losing control over a project that would have a significant impact on the community, the zoning board proceeded with hearings on the application that Churchill & Banks submitted.

Even after the initial hearing, the prospect of ceding oversight of the application to SHAB continued unabated until the passage of the moratorium because § 45-53-5 gave developers a right to appeal to SHAB for any delays in the process they deemed objectionable. See also SHAB Regulation 2.08(ii). Indeed, an admonition issued by Churchill & Banks's attorney at the February 11, 2004 zoning board meeting attests to the enduring force of that possibility:

"We could take the position that your failure to hear this, because you're going to take a vote on February 25, and if you vote not to allow us to go forward, we may very well take the position that you've denied our application. *We will go to SHAB, we will appeal to SHAB.* They may hear it as a denial and we may then move forward. *And now what has happened? You have deprived yourselves of the right to do what the Statute gives you the right to do: Hear our evidence, decide our case, perhaps grant it, perhaps modify it, perhaps deny it.*" (Emphases added.)

Of course, on February 11, 2004, the zoning board did not continue hearings on the application, and true to the ominous hypothetical offered by Churchill & Banks, the case eventually ended up before SHAB. As it turned out, SHAB did not completely wrest control of the final disposition of Churchill & Banks's case from the zoning board, but it did order the zoning board to apply the less stringent standards of the pre-moratorium approval process.

To buttress SHAB's observation that the zoning board failed to certify its application as incomplete, Churchill's brief points out that § 45-53-4(a)(2) confers upon zoning boards a duty to certify a deficient application as incomplete and notify the applicant of that certification. This certification requirement makes great sense, and it would have been helpful here,

---

11. A Hobson's choice is "[a]n apparently free choice that offers no real alternative. [After Thomas *Hobson* (1544?–1630), English keeper of a livery stable, from his requirement that customers take either the horse nearest the stable door or none.]" American Heritage Dictionary of the English Language 835 (4th ed.2000).

but it was passed *after the moratorium.* *See* P.L.2004, ch. 286, § 11 (enacted July 2, 2004). There was no such formal certification process in place when Churchill & Banks's application came before the zoning board. *See* § 45–53–4, as amended by P.L.2002, ch. 416, § 1. And although SHAB's finding that the zoning board never took a "formal vote determining Churchill & Banks' Application to be incomplete" is factually accurate, the evidentiary value which that purported omission may carry in hindsight dissipates precipitously when one considers it from the perspective of the zoning board dealing with the Low and Moderate Income Housing Act as it read before the moratorium. Moreover, it is not as if the zoning board never gave Churchill & Banks any indication that its application was not yet substantially complete. In an October 3, 2003 memo, the Smithfield building official listed twelve items that Churchill & Banks's application did not adequately address. And although it is true that the town solicitor indicated to Churchill & Banks's attorney that this memo should be considered only "advisory," it nevertheless placed Churchill & Banks on notice concerning a number of holes in its application.

Before the moratorium, the zoning board was swimming in an ocean of applications and struggling to keep its head above the unrelenting waves of documents and testimony. When taking the measure of its conduct, one has to dive into those same metaphorical waters; the view from the beach after the surf has subsided does not present the same picture. In concluding that the town treated Churchill & Banks's application as if it were substantially complete, SHAB apparently gave no consideration to two factors that this Court deems critical: (1) the statutory pressure the zoning board was under to convene and continue to hold hearings to comply with the pre-moratorium version of § 45–53–4; and (2) the content of the October 3, 2003 memo, which indicated that Churchill & Banks's application was deficient on twelve of the eighteen elements required by Smithfield zoning ordinances for a complete application. We conclude therefore, that there was insufficient evidence to support SHAB's finding that the zoning board acted in a manner that would indicate that it viewed Churchill & Banks's application to be substantially complete.

## Conclusion

Accordingly, we reverse the decision of the State Housing Appeals Board, to which we remand the papers in the case. In accordance with the provisions of § 45–53–6(f)(2), the Smithfield Zoning Board no longer is under any obligation to hear the comprehensive permit application of Churchill & Banks Companies, LLC.