DECISION
Before this Court is an appeal by Quidnessett Country Club, Inc. of a decision by the Board of Assessment Review of the Town of North Kingstown. The Board of Assessment Review's decision, issued February 18, 2004, affirmed a decision by the North Kingstown Tax Assessor denying Quidnessett Country Club, Inc.'s application to classify its property as "open space land" for tax purposes pursuant to G.L. 1956 § 44-27-5. Jurisdiction is pursuant to § 44-27-6(a).
 I Facts and Travel
Quidnessett Country Club, Inc. (Quidnessett), a Rhode Island corporation, is the owner of three contiguous lots in North Kingstown, Rhode Island, totaling 184.67 acres. The lots are designated as Lot 3 on Tax Assessor's Plat 32; Lot 528 on Tax Assessor's Plat 166; and Lot 2 on Tax Assessor's Plat 167. The three lots (the "property") consist mainly of land used as a golf course. (Tr. dated April 12, 2007 at 9-10). However, wooded areas and wetlands dot parts of the *Page 2 
property. Id. at 8-9. Additionally, a clubhouse and other country club facilities, as well as some residential townhouses, are located on the property. Id.
The Town of North Kingstown (the "Town") is the holder of two easements on Quidnessett's property. Quidnessett granted the first of these easements on July 29, 1999, as part of a plan approved by the North Kingstown Planning Commission to permit Quidnesset to construct residential townhouse units on the property. (Grant of easement, dated July 29, 1999.) Among other provisions, the easement, which titles itself an "open space easement and covenant," prohibits most future development on 166 acres of Quidnessett's property, and it limits uses of the property to recreational, agricultural, and conservation uses.[1] Id. However, the easement terms also permit roadways on the easement area to provide access to the golf course, and some small structures may be built within the easement area with approval from the North Kingstown Planning Commission. Id.
On September 6, 2001, Quidnessett granted a second easement to the Town on 18.67 acres of its property in exchange for permission to construct more townhouses. The terms of the second easement were equivalent to those of the prior easement. (Grant of easement, dated September 6, 2001.) Thus, easements now extend to all 184.67 acres of the three lots at issue.
On or about January 17, 2003, Quidnessett applied to the North Kingstown Tax Assessor to classify its property as "open space land."See § 44-27-5(a)(1) (requiring property owners to apply to local tax assessor for designation of property "open space land"); see also
§ 44-27-2(3) *Page 3 
(defining "open space land"). Property taxes in Rhode Island are assessed based on a property's "full and fair cash value." Section 44-5-12(a). However, for property "classified as farm land, forest, or open space land" under chapter 27 of title 44, tax assessors determining full and fair cash value are permitted to "consider no factors . . . other than those which relate to that [farm land, forest, or open space land] use without regard to neighboring land use of a more intensive nature." Section 44-5-12(a)(2). Essentially, § 44-5-12(a)(2) requires that property classified as farm land, forest, or open space land be valued, for tax purposes, based on the property's actual use, rather than based on its potential value as developable land — potentially at great savings to the property owner. See Nunes v. Marino, 707 A.2d 1239,1240 (R.I. 1998) (classification as "farmland" grants landowner "benefit of reduced property tax liability").
On or about August 8, 2003, North Kingstown's Tax Assessor denied Quidnessett's application to classify its property as "open space land." Aggrieved landowners may appeal such denials to a local board of assessment review. See § 44-27-5(d);[2] see also § 45-27-12(3) (granting boards the authority to hear appeals of classification decisions by local tax assessors). Quidnessett filed an appeal with the Board of Assessment Review (Board) on or about August 19, 2003.
The Board held a hearing on the appeal on January 13, 2004, at which it requested additional information from Quidnessett regarding the use of its property. (Minutes of Board meeting, dated Feb. 17, 2004). On February 17, 2004, after learning more about the property, the Board voted unanimously to deny the appeal. Id. In a letter to Quidnessett issued on February 18, *Page 4 
2004, the Board informed Quidnessett of the denial, stating simply: "Based upon the information available to us, it is our opinion that the assessment and classification of the property is correct, and we are unable to change the present assessment." (Letter by Board of Assessment Review, dated Feb. 18, 2004.)
Quidnessett filed an appeal to this Court on May 11, 2004.See § 44-27-6(a) (permitting appeal of decisions by board of assessment review to the Superior Court within 90 days). On June 8, 2004, the parties stipulated to an agreement remanding the matter to the Board in order to permit the Board to receive testimony from various state and local boards and agencies, as is contemplated by § 44-27-5(d).[3]
(Stipulation, dated June 8, 2004); see also § 44-27-6(b) (providing that trial justice may order a board of assessment review to receive additional evidence and that board may thereafter modify decision).[4]
In the ensuing months, the Board received letters from officials from the North Kingstown Planning Commission; the North Kingstown Conservation Commission; the Statewide Planning Program, an office within the state's Department of Administration; and the Rhode Island Department of Environmental Management. Additionally, the Board received a letter from Jeffrey Seeman, Dean of the College of the Environment and Life Sciences at The *Page 5 
University of Rhode Island. None of these officials recommended designating Quidnessett's property as "open space land" based on their understanding of the characteristics of Quidnessett's property and the statutory requirements for the designation. However, the possibility that certain tracts of Quidnessett's property could qualify was raised in the letters from the officials at the Department of Environmental Management and the Statewide Planning Program.
After a hearing on October 27, 2004, the Board decided not to reverse its prior decision. The matter was returned to this Court, and, in July 2005, the parties submitted legal memoranda. On October 24, 2005, this Court granted a motion by Quidnessett to remand the matter to the Board once again, so that Quidnessett could present additional evidence regarding the ecological benefits of golf courses. (Order, dated Oct. 24, 2005; Plaintiff's Motion for Leave to Present Additional Evidence.)
On April 12, 2007, the Board held a final hearing on the matter. Scott W. Rabideau, a wetlands biologist testifying as an expert for Quidnessett, estimated that of the 201 acres he surveyed — a figure apparently including land beyond the 184.67 acres at issue — approximately 121 acres are used as a golf course. (Tr. at 8-10). Another 21.5 acres consist of country club facilities, townhouses, and similar development, while nearly 60 acres are wetlands and woodlands.Id. at 9-10. Rabideau further found that Quidnessett's property provides valuable habitat for geese, owls, foxes, coyotes, and other wildlife.Id. at 11-12. However, Linda A. Steere, a wildlife biologist who studied the property on behalf of the Town of North Kingstown, characterized the property as providing habitat not particularly different from habitat necessary to support urban wildlife, noting "you are not going to find a large diversity of wildlife there that need natural habitats."Id. at 14-18. *Page 6 
Following the April 12, 2007 hearing, the Board did not reverse its decision, and the matter has returned to this Court. The parties having filed supplemental legal memoranda, and with no further requests to enter additional evidence into the record, this Court now proceeds to decision.
 II Standard of Review
The Superior Court's review of decisions by a board of assessment review is governed by § 44-27-6(c), which states:
 "The court shall not substitute its judgment for that of the board of assessment review, or city or town council, as to the weight of the evidence on question of fact. The court may affirm the decision of the board of assessment review, or city or town council, or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the board of assessment review, or city or town council, by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Section 44-27-6(c)
This standard of review is analogous to the standard applied by this Court in reviewing administrative agency decisions. See Munroe v. Townof E. Greenwich, 733 A.2d 703, 705 (R.I. 1999) (noting that standard of review for planning board of appeal decisions is the same as the "traditional judicial review standard that is applied in administrative-agency actions"). As such, "the Superior Court does not consider the credibility of witnesses, weigh the evidence, or make its own findings of fact." Id. The Superior Court's review is limited to "an examination of the *Page 7 
certified record to determine if there is any legally competent evidence therein to support the agency's decision." Nickerson v. Reitsma,853 A.2d 1202, 1205 (R.I. 2004) (quoting Barrington School Committee v. R.I.State Labor Rels. Bd., 608 A.2d 1126, 1138 (R.I. 1992)). Legally competent evidence is defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance."Town of Smithfield v. Churchill Banks Cos., LLC, 924 A.2d 796, 806
(R.I. 2007) (quoting Foster-Glocester Regional School Committee v. Bd.of Review, 854 A.2d 1008, 1012 (R.I. 2004)).
However, determinations of law "are not binding upon [the Court] and may be freely reviewed to determine the relevant law and its applicability to the facts presented in the record." Dep't of Envt'lMgmt. v. Labor Rels. Bd., 799 A.2d 274, 277 (R.I. 2002) (citingCarmody v. R.I. Conflict of Interest Comm'n, 509 A.2d 453, 458 (R.I. 1986)). Thus, "[a]lthough factual findings of an administrative agency are afforded great deference, a dispute involving statutory interpretation is a question of law to which [the Court] appl[ies]de novo review." Rossi v. Employees' Retirement Sys. of the State ofRhode Island, 895 A.2d 106, 110 (R.I. 2006) (citing In re AdvisoryOpinion to the Governor, 732 A.2d 55, 60 (R.I. 1999)).
 III Analysis
To receive favorable tax treatment under § 44-5-12(a)(2), a property must be classified as either "farmland," "forest land," or "open space land" pursuant to chapter 27 of title 44. Quidnessett seeks designation of the three lots at issue as "open space land," which is defined as:
 "any tract or contiguous tracts of undeveloped land, where the undeveloped land serves to enhance agricultural values, or land in its natural state that conserves forests, enhances wildlife habitat or protects ecosystem health, and that is: *Page 8 
 (i) Ten (10) total acres or larger, exclusive of house site, where "house site" means the zoned lot size or one acre, whichever is smaller, and land surrounding dwellings or devoted to developed facilities, such as tennis courts, pool, etc., related to the use of the residence; or
 (ii) Tracts of land of any size that are designated as open space land in the comprehensive community plan; or
 (iii) Tracts of land of any size that have conservation restrictions or easements in full force and applied for as open space, which shall be taxed on an equitable basis." Section 44-27-2(3).
The current definition was enacted relatively recently, in 2001.See P.L. 2001, ch. 350, § 1.[5] Broadly speaking, the present definition creates a two-part test for classification of property as *Page 9 
"open space land." First, the property must be either "undeveloped land" which "serves to enhance agricultural values" or it must be "land in its natural state that conserves forests, enhances wildlife habitat or protects ecosystem health." Second, the property must satisfy one of the three listed criteria.[6]
Relatively few cases besides Nunes have interpreted the provisions of chapter 27 of title 44. See, e.g., Denault v. Fitzgerald, 593 A.2d 453,454-56 (R.I. 1991) (holding that landowner buying part of tract qualifying as open space land could continue designation); Ajootian v.Hazard, 488 A.2d 413, 416-18 (R.I. 1985) (affirming tax assessor's valuation of property designated as "forest land"). In interpreting the above definition, this Court therefore turns to the rules of statutory construction. Those rules have established that "when the language of a statute is clear and unambiguous, [the Court] must enforce the statute as written by giving the words of the statute their plain and ordinary meaning." Park v. Rizzo Ford, Inc., 893 A.2d 216, 221 (R.I. 2006) (quoting Gem Plumbing Heating Co. v. Rossi, 867 A.2d 796, 811 (R.I. 2005)). However, "when the provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency, or board, charged with its enforcement is entitled to weight and deference, as long as that construction is not clearly erroneous or unauthorized." Pawtucket Transfer Operations, LLC v. Cityof Pawtucket, 944 A.2d 855, 859-860 (R.I. 2008) (citing Flather v.Norberg, 119 R.I. 276, 283 n. 3, 377 A.2d 225, 229 n. 3 (1977)). *Page 10 
In the case at bar, Quidnessett's property does not satisfy the first part of the definition of "open space land." At the outset, regardless of whether the property could be considered "undeveloped land,"[7]
this Court is not persuaded that the property "serves to enhance agricultural values." Agriculture has been defined as "the art or science of cultivating the ground, including harvesting of crops and rearing and management of livestock." Farmegg Products, Inc. v. HumboldtCounty, 190 N.W.2d 454, 457-58 (Iowa 1971) (internal citation and quotation omitted). Although "undeveloped land" enhancing "agricultural values" presumably would encompass some land not qualifying as "farmland" under § 44-27-2(1), [8] the requirement that the property "enhance agricultural values" constitutes a prominent clause in the definition of "open space land" and cannot be construed so broadly as to be without meaning. See Tidewater Realty, LLC v. State, 942 A.2d 986,993 (R.I. 2008) (stating rule that Court will "not construe a statute to achieve meaningless or absurd results"). Here, there is nothing in the record to suggest that Quidnessett's property has any agricultural aspect. The Board received little or no testimony to *Page 11 
the effect that the property "serves to enhance agricultural values." The Board was authorized to reverse the tax assessor only upon a showing "by a preponderance of the evidence that [the tax assessor's] designation was erroneous." Section 44-27-5(e)(1). It is especially noteworthy that Quidnessett has not even attempted to argue that its property enhances agricultural values, choosing instead to overlook that part of the definition.[9]
The first part of the definition of "open space land" also is satisfied where a property qualifies as "land in its natural state that conserves forests, enhances wildlife habitat or protects ecosystem health." Although Quidnessett's property arguably might preserve some woodlands and enhance wildlife habitat, as a whole it could not be considered "land in its natural state." The most relevant definition of "natural" in Black's Law Dictionary defines the term as "brought about by nature as opposed to artificial means." Black's Law Dictionary 1054 (8th ed. 2004). Quidnessett's property is predominantly a golf course. The fairways, landscaping, and roadways on a golf course are brought about by careful human planning; a golf course does not arise spontaneously in nature. As Seeman noted in his letter to the Board, a golf course "requires a reasonably intensive level of care" which includes mowing and the use of fertilizers. (Letter from Jeffrey Seeman dated 8/13/04). Quidnesset nevertheless argues that the property is "land in its natural state" because it is "utilized by wildlife" who go "uninterrupted" and "unmolested." (Quidnessett's Supp. Mem. at 4.) This argument is, in the very least, farfetched. Under such an expansive definition, "land in its natural state" would include urban environments, where birds, rodents, and creatures also go about their business unbothered. *Page 12 
Notwithstanding that Quidnesset's property is neither "undeveloped land" enhancing "agricultural values" nor "land in its natural state," the property meets the second part of the definition of "open space land." The property is greater than 10 acres in size, thereby meeting the requirements of § 44-27-2(3)(i). Additionally, the two easements on the property may qualify as "conservation restrictions or easements in full force" under § 44-27-2(3)(iii).[10] However, both parts of the definition of "open space land" must be satisfied. Because Quidnessett's property does not satisfy the first part of the definition, it is of little consequence that the property may satisfy the definition's latter portion. Accordingly, this Court concludes that the Board's decision must be upheld.
Should there remain any ambiguity regarding whether Quidnessett's property meets the definition of "open space land" in § 44-27-2(3), the Board's decision merits deference, as it is not clearly erroneous or unauthorized. "[W]hile not controlling, the interpretation given a statute by the administering agency is entitled to great weight."State v. Swindell, 895 A.2d 100, 104 (R.I. 2006) (internal citation and quotation omitted). In this Court's view, the fact that § 44-27-5(d) requires the Board to consult with statewide authorities in interpreting § 44-27-2(3), and that none of those authorities recommended classifying the property as "open space land," further lends credence to the Board's decision.
Nonetheless, Quidnessett contends, relying on George, Inc. v.Norberg, 444 A.2d 868, 870 (R.I. 1982), that the definition of "open space land" should be construed in its favor because tax-related statutes must be construed in favor of the taxpayer. InGeorge, which was not a case construing chapter 27 of title 44, the Rhode Island Supreme Court found that "revenue statutes *Page 13 
are to be construed strictly, with doubts about their meaning and scope resolved in favor of the taxpayer and against the taxing authority."George, Inc., 444 A.2d at 870. This holding reflects the sense that "[t]he legislative intent to impose the burden of a tax is not to be found by implication nor conjecture." Potowomut Golf Club v.Norberg, 114 R.I. 589, 592, 337 A.2d 226, 227 (1975) (internal citation and quotation omitted).
In this case, however, the rationale for the rule stated inGeorge does not apply because meeting the terms of the statute at issue potentially reduces, rather than increases, Quidnessett's tax liability; that is, "strict construction" of the statute, as called for inGeorge, actually favors the Board's decision. If anything, granting deference to the Board's decision makes more sense, both because of the deference granted to administrative agency interpretations, and because the statute at issue leads to advantageous tax treatment in a manner which could be considered analogous to a tax exemption statute.See, e.g., Delta Airlines, Inc. v. Neary, 785 A.2d 1123, 1126 (R.I. 2001) (stating rule that tax exemption statutes are construed in favor of the taxing authority).
Quidnessett raises a number of other arguments, all of them without merit. First, Quidnessett asserts that the Board, by refusing to classify its property as open space land, is contradicting North Kingstown's own zoning ordinance, which expressly includes "golf and country clubs" within the definition of "open space."[11] Quidnessett also points out that the residential townhouses it constructed were approved by the North Kingstown Planning Board as *Page 14 
a "cluster development," a type of development designed to promote open space by permitting increases in density in exchange for the granting of open space easements. See North Kingstown Zoning Ordinance §§ 21-211 through 21-218.[12]
These objections fail to account for the fact that North Kingstown may define "open space" differently for zoning purposes than it does for tax purposes. The content of zoning ordinances is primarily governed by the Zoning Enabling Act, G.L. 1956 chapter 24 of title 45, which does not provide a definition of "open space land." Furthermore, there is no requirement in chapter 27 of title 44 that municipalities grant "open space land" designation to any property which qualifies as "open space" pursuant to local zoning ordinances. In fact, § 44-27-2(3) allows for the possibility that land may be "designated as open space land in the comprehensive community plan" or subject to "easements in full force and applied for as open space" but still not meet the definition of "open space land." Thus, the structure of § 44-27-2(3) makes it clear that the definition of "open space" may vary depending on context. As to Quidnessett's argument that it is unfair for North Kingstown to restrict development on its property yet not grant it "open space land" designation, Quidnessett cannot object that it received nothing in exchange for the easements — the granting of which permitted Quidnessett to construct the townhouses.
Finally, Quidnessett notes that many other states have chosen to grant tax advantages to golf course property. See, e.g., Ariz. Rev. Stat. § 42-13152 (2008) (outlining method for calculating property value of golf courses "in recognition of the importance of the open space and economic benefits of golf courses"); Cal. Const. art. 13, § 10 (requiring that property used as a non-profit golf course be taxed based on golf course use); 35 Ill. Comp. Stat. 200/10-155 (2008) (including land that "conserves landscaped areas, such as public or private golf courses" *Page 15 
within definition of "open space land" for property tax purposes). Although these states have granted tax advantages to golf courses, it has not been demonstrated that Rhode Island has opted to take the same approach. Ultimately, the statutory language of § 44-27-2(3) is controlling.
Should the Legislature wish to include golf courses within the definition of "open space land" it is free to amend the definition accordingly. A letter from the co-chair of the Department of Environmental Management subcommittee, which drafted the present definition, indicates that the definition of "open space land" may have been written without taking into account whether golf courses should qualify. As the co-chair wrote to the Board, "[o]ur subcommittee did not address golf courses." (Letter from Thomas A. Dupree, dated Aug. 5, 2004.) Quidnessett notes that one of the purposes of chapter 27 of title 44 is "to prevent the forced conversion of farm, forest, and open space land to more intensive uses as the result of economic pressures caused by the assessment for purposes of property taxation at values incompatible with their preservation as farm, forest, and open space land." Section 44-27-1(2). It is for the Legislature to decide how best to serve this purpose.
Quidnessett applied to the Board for "open space land" designation for the entire 184.67 acres of the three lots at issue. Whether any distinct parcels of land within these lots would qualify for "open space land" or even "forest land" designation was not before the Board.[13] Possibly, Quidnessett may wish to submit a new application for certain tracts only, particularly for some of the larger areas of woodlands or wetlands if it can establish that they have ecological *Page 16 
value. As observed, the officials from the Department of Environmental Management and the Statewide Planning Program both recommended such an approach in their letters to the Board.
 IV Conclusion
Quidnessett's property, as a whole, does not qualify as "open space land" under § 44-27-2(3) because it is neither "undeveloped land" serving to "enhance agricultural values" nor "land in its natural state that conserves forests, enhances wildlife habitat or protects ecosystem health." This Decision does not reach whether certain tracts of land within Quidnessett's property might qualify, as that issue was not before the Board. Accordingly, this Court upholds the Board's decision.
Counsel for appellee shall submit an appropriate order consistent with this Decision within 10 days from the filing of the Court's Decision.
[1] Specifically, the easement prohibits (1) the "development of the easement area" and any use changes beyond "recreational, agricultural, or conservation uses"; (2) the erection of structures on the easement area not approved by the Planning Board; (3) the dumping of rubbish, garbage, or fill in the easement area; (4) excavation or topographical changes within the easement area; and (5) the use of motorized vehicles in the easement area except golf carts and golf maintenance equipment. (Grant of easement, dated July 29, 1999.) Nevertheless, the easement does not prohibit all future development. For instance, the easement also states: "Roadways within the property providing access to and from the golf course and from the golf course facilities and the residential development from North Quidnessett Road shall be allowed within the easement area." Id. Presumably, the "residential development" mentioned here refers to the townhouses approved by the Planning Commission.
[2] Section 44-27-5(d) provides, in relevant part:
 "Any landowner aggrieved by: (1) the denial of an application filed in accordance with the provisions of subsections (a) and (b) of this section by the assessor of a city or town for classification of land as open space land; or (2) the use value assessment placed on land classified as open space land by the assessor; has the right to file an appeal within ninety (90) days of receiving notice, in writing, of the denial or the use value assessment with the board of assessment of review of the city or town."
[3] Regarding the testimony that a board of assessment review must consider, § 44-27-5(d) states:
 "The assessor shall be given the opportunity to explain either his or her refusal to classify the land or the assessment placed on the classified land. The board of review or city or town council shall also consider the testimony of the landowner and the city or town's planning board and conservation commission, if they exist. They shall also seek and consider the advice of the office of state planning, the department of environmental management, the dean of the college of resource development and the conservation district in which the city or town is located."
[4] Section 44-27-6(b) grants the Superior Court the authority to remand matters to a board of assessment review as follows:
 "If, before the date set for the hearing in the superior court, application is made to the court for leave to present additional evidence before the board of assessment review, or city or town council, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for the failure to present it at the hearing before the board of review, or city or town council, the court may order that the additional evidence be taken before the board of review, or city or town council, upon conditions determined by the court. The board of review, or city or town council, may modify its findings and decision by reason of that additional evidence and file that evidence and any modification, new findings, or decisions with the superior court."
[5] In 2001, the statute was amended as follows:
 "(3) The term `open space land' means any tract or contiguous tracts of undeveloped land, where said undeveloped land serves to enhance agricultural values, or land in its natural state that conserves forests, enhances wildlife habitat or protects ecosystem health, and that are: including farmland and forest land that are:
 (i) Ten (10) total acres or larger and, exclusive of house site, where "house site" means the zoned lot size or one acre, whichever is smaller, and land surrounding dwellings or devoted to developed facilities, such as tennis courts, pool, etc., related to the use of the residence; or
 (A) Are prime or unique agricultural land as defined by the soil conservation service, United States department of agriculture and which does not fall within the definition of subdivision (a); or
 (B) Have more than one percent (1%) of the surface area made up of exposed bedrock or soils too thin over bedrock for use; or
 (C) Have soils which inhibit the natural vertical movement of water or that have a seasonal high water table less than four feet (4') below the surface in areas without sewer service; or
 (D) Are an important habitat for wild life, including, but not limited to, habitat for rare or endangered species; or
 (E) Land that enhances the value to the public of abutting or nearby parks, recreation areas, forest wildlife preservation, nature reserves, sanctuaries, or historic places;
 (ii) Tracts of land of any size that are designated as open space land in the comprehensive community plan; or
 (A) That have an average slope exceeding eight percent (8%) and which is subject to erosion or mass movement and not part of an existing or planned development; or
 (B) That have a one percent (1%) or greater chance of flooding in any given year; or
 (C) That meet the criteria of fresh water wetlands as defined in chapter 1 of title 2; or
 (D) That meet the criteria of salt marshes and coastal wetlands as defined in chapter 46.1 of title 11 and chapter 1 of title 2; or
 (E) That are necessary as buffer strips to protect surface water bodies from erosion or pollution from runoff or leachate; or
 (F) That are ground water aquifer recharge areas as described on the ground water maps of the U.S. geological survey and the Rhode Island water resources board, providing that these areas have been designated on the basis of hydrogeological data; or
 (G) That have unstable geologic features; or
 (H) That are barrier beaches, dunes, cliffs, ledges, or bluffs, subject to rapid deterioration through the action of wind or wave; or
 (I) That are designated as open space land on the comprehensive community plan; or
 (J) That other significant or unique natural areas such as rare or valuable ecosystems, biological features or geological features, or areas designated or regulated as such by the state, federal, or local government or nonprofit organizations of recognized competence.
 (iii) Tracts of land of any size that have conservation restrictions or easements in full force and applied for as open space, which shall be taxed on an equitable basis." P.L. 2001, ch. 350, § 1.
[6] The three criteria in the latter portion of the definition apply regardless of how the first portion of the definition is satisfied. The comma following the word "health" indicates that the three criteria are independent of "land in its natural state that conserves forests, enhances wildlife or protects ecosystem health[.]"
[7] Black's Law Dictionary defines "development" as "[a] human-created change to improved or unimproved real estate, including buildings or other structures, mining, dredging, filing, grading, paving, excavating, and drilling." Black's Law Dictionary 482 (8th ed. 2004). The Zoning Enabling Act, G.L. 1956 chapter 24 of title 45, although not controlling here, defines "development" as "[t]he construction, reconstruction, conversion, structural alteration, relocation, or enlargement of any structure; . . . or any change in use, or alteration or extension of the use, of land." G.L. 1956 § 45-24-31(20). It is clear that most of Quidnessett's property would not qualify as "undeveloped land" if that definition requires a complete absence of development. Nevertheless, the fact that the definition of "open space land" distinguishes between "undeveloped land" and "land in its natural state" implies that "undeveloped land" is not required to be land where nature has been left free to take its course. Quidnessett's property, to be sure, is less developed than a residential subdivision or shopping center, but more developed than, for instance, a vacant lot. Furthermore, in this Court's view, the fact that easements restricting development are recorded on the property does not settle whether the property is undeveloped.
[8] Pursuant to § 44-27-2(1), "farmland" is defined as:
 (i) Any tract or tracts of land, including woodland and wasteland constituting a farm unit;
 (ii) Land which is actively devoted to agricultural or horticultural use including, but not limited to: forages and sod crops; grains and feed crops; fruits and vegetables; poultry, dairy, and other livestock and their products; nursery, floral, and greenhouse products; other food or fiber products useful to people;
 (iii) When meeting the requirements and qualifications for payments pursuant to a soil conservation program under an agreement with the federal government, the director of environmental management is authorized to promulgate and adopt rules and regulations defining particular categories and minimum acreages of land eligible for designation as farmland under this chapter." Section 44-27-2(1).
[9] If Quidnessett minimizes the need to demonstrate that the property qualifies as "undeveloped land," this may stem from a wishful interpretation of the legislative history of § 44-27-2(3). Prior to amendments to the act in 2001, the first part of the definition of open space land required only that the property be "any tract or contiguous tracts of undeveloped land." See P.L. 2001, ch. 350, § 1.
[10] Quidnessett argues that its property is "open space" as defined by North Kingstown's Comprehensive Community Plan and, presumably, that its golf course satisfies § 44-27-2(3)(ii), which requires that the property be "designated as open space land in the comprehensive community plan." However, this Court declines to address the issue.
[11] Pursuant to the North Kingstown Zoning Ordinance, "open space" is defined as:
 "any land that is primarily undeveloped, including public and semipublic open lands, and private development requiring little or no construction. The purpose of this land is to provide park, recreational, historic and scenic uses, and to provide for the conservation of land and other natural resources. The following uses are considered to be in character with the concepts of this definition: farming, conservation, historic area, hunting preserves, state and local parks, parkways, playfields, playgrounds, reforestation areas and wood lots, reservations, watersheds and water supply lands, wildlife refuges, nature centers, day and overnight camps for children, golf and country clubs, and sports clubs." North Kingstown Revised Ordinances § 21-22.
[12] The North Kingstown Zoning Ordinance now refers "cluster developments" as "conservation developments." See North Kingstown Revised Ordinances § 21-211.
[13] Pursuant to § 44-27-2(2), "forest land" is defined as:
 "any tract or contiguous tracts of land, ten (10) acres or larger bearing a dense growth of trees, including any underbrush, and having either the quality of self perpetuation, or being dependent upon its development by the planting and replanting of trees in stands of closely growing timber, actively managed under a forest management plan approved by the director of environmental management." *Page 1