**TOWN OF BURRILLVILLE et al.**

v.

**PASCOAG APARTMENT ASSOCIATES, LLC, et al.**

No. 2005–35–M.P.

Supreme Court of Rhode Island.

July 3, 2008.

Patrick Dougherty, for Plaintiff.

William Landry, for Defendant.

Present: WILLIAMS, C.J.,
GOLDBERG, FLAHERTY, SUTTELL,
and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

We issued a writ of certiorari to review the State Housing Appeals Board's (SHAB) decisions that three separate applications for comprehensive permits submitted by Pascoag Apartment Associates, LLC and Yorkshire Properties (Pascoag), Crystal Lake Builders, LLC (Crystal Lake), and East Avenue Development Realty, LLC (East Avenue) (collectively respondents), under the Low and Moderate Income Housing Act, G.L. 1956 chapter 53 of title 45, were, as of February 13, 2004, substantially complete under § 45–53–6(f)(1). The three applicants presented plans and documentation to the Town of Burrillville Zoning Board of Review in early 2004. While the applications were pending, the General Assembly imposed a moratorium on the use of comprehensive permit applications by private, for-profit developers such as the ones in this case. Only those applications that SHAB deemed to be substantially complete as of February 13, 2004, were allowed to proceed. SHAB made such a determination for all three of the projects under review.

For the reasons set forth in this opinion, we reverse the decisions of SHAB.

## I

### Statutory Background

In 1991, the General Assembly enacted the Low and Moderate Income Housing Act (the act) to address the "acute shortage of affordable, accessible, safe and sanitary housing for * * * citizens of low and moderate income." P.L. 1991, ch. 154, § 1 (§ 45–53–2). The act "provides for a streamlined and expedited application procedure whereby 'a single application for a [comprehensive permit] to build [low and moderate income] housing in lieu of separate applications to the applicable local [municipal] boards' may be submitted to the zoning board of review of a city or town." *East Bay Community Development Corp. v. Zoning Board of Review of Barrington*, 901 A.2d 1136, 1145 (R.I.2006) (quoting *Coventry Zoning Board of Review v. Omni Development Corp.*, 814 A.2d 889, 894 (R.I.2003)). The key section of the 1991 version of the act, codified at § 45–53–4 and since amended, directed zoning boards to hold a hearing within thirty days of receipt of the application. P.L. 1991, ch. 154, § 1. Zoning boards were required to "render a decision, based upon a majority vote of said board, within forty (40) days after the termination of the public hearing * * *." *Id.*[1] If the zoning board failed to hold a public hearing or render a decision within the forty-day window, the application was "deemed to have been allowed and the approval shall forthwith issue." *Id.* Further, if the zoning board denied the application or granted it with conditions that made the project infeasible, the applicant could appeal to SHAB, which then had the power to usurp

---

1. The review process set forth in the 1991 version of G.L. 1956 § 45–53–4 survived in large part until July 2, 2004, when the General Assembly overhauled the statute's language. *See* P.L. 2004, ch. 286, § 11.

the zoning board's control over the review process and approve the project by itself. *See* P.L. 1991, ch. 154, § 1 (codified as amended at § 45–53–5 and § 45–53–6); *Town of Smithfield v. Churchill & Banks Companies, LLC,* 924 A.2d 796, 807 (R.I. 2007).

The original version of the act made the streamlined review process available to public agencies, nonprofit organizations, and limited-equity housing cooperatives. P.L. 1991, ch. 154, § 1. Private for-profit developers could take advantage of the act only for projects that included the construction of low or moderate income rental units that remained as such for not less than thirty years. *Id.* On June 28, 2002, however, the General Assembly made a significant modification to the act that allowed for-profit developers to use the streamlined review process for non-rental housing projects with low- or moderate-income components. P.L. 2002, ch. 416, § 1. Under the revised language of § 45–53–4, for-profit developers were allowed to apply for "comprehensive permit[s]" to build developments that included low or moderate income for-sale housing. P.L. 2002, ch. 416, § 1. Developers thus could take advantage of "one stop shopping" in front of a zoning board by including affordable housing in their applications in lieu of navigating the crowded universe of local review boards. *See Town of Smithfield,* 924 A.2d at 797–98 n. 1. Not surprisingly, the 2002 amendment opened the floodgates. Municipalities faced a deluge of applications from for-profit developers seeking to take advantage of the streamlined review process. *See Town of Smithfield,* 924 A.2d at 798.

The General Assembly reacted to the influx in early 2004 by imposing a moratorium on applications by for-profit developers. P.L. 2004, ch. 3, § 1 (codified as amended at § 45–53–4(b)).[2] The moratorium was effective from February 13, 2004, to January 31, 2005. P.L. 2004, ch. 3, § 1. During the moratorium, the General Assembly amended the act again, effective July 2, 2004, to allow for-profit developers affected by the moratorium to move forward if their applications were deemed to have reached "substantial completeness." P.L. 2004, ch. 286, § 10 (codified as amended at § 45–53–6(f)(1)). Applicants wishing to continue the permitting process under pre-moratorium standards were required to appeal to SHAB before August 1, 2004, after which SHAB was required to "rule on December 1, 2004, on the substantial completeness of applications as of February 13, 2004 * * *." P.L. 2004, ch. 286, § 10 (codified as amended at § 45–53–6(f)(1)).

The act's terms, which remain in force today, allow the obtainment of substantial completeness in one of two ways. SHAB can determine that a zoning board of review acted in a manner demonstrating that it considered the application substantially complete. P.L. 2004, ch. 286, § 10 (codi-

---

2. As justification for the moratorium, the General Assembly found that:

"[I]n January 2004 cities and towns throughout Rhode Island have been confronted by an unprecedented volume and complexity of development applications as a result of private for-profit developers using the provisions of this chapter and that in order to protect the public health and welfare in communities and to provide sufficient time to establish a reasonable and orderly process for the consideration of applications made under the provisions of this chapter, and to have communities prepare plans to meet low and moderate income housing goals, that it is necessary to impose a moratorium on the use of comprehensive permit applications as herein provided by private for-profit developers * * *." P.L. 2004, ch. 3, § 1 (codified as amended at § 45–53–4(b)).

fied as amended at § 45–53–6(f)(1)(A)(ii)).[3] In the alternative, SHAB can find substantial completeness by applying a ten-factor list promulgated by the General Assembly. Under this latter approach, § 45–53–6(f)(1)(i) instructs that the "determination of substantial completeness shall be based on whether there was on or before February 13, 2004, substantial completeness of substantially all of the following" ten factors:

"(A) A written request to the zoning board of review to submit a single application to build or rehabilitate low or moderate income housing in lieu of separate applications to the application local boards;

"(B) A written list of variances, special use permits and waivers requested to local requirements and regulations, including local codes, ordinances, bylaws or regulations, including any requested waivers from the land development or subdivisions regulations, and a proposed timetable for completion of the project;

"(C) Evidence of site control;

"(D) Evidence of eligibility for a state or federal government subsidy, including a letter from the funding agency indicating the applicant and the project;

"(E) Site development plans showing the locations and outlines of proposed buildings; the proposed location, general dimensions and materials for street, drives, parking areas, walks and paved areas; proposed landscaping improvements and open areas within the site;

and the proposed location and types of sewage, drainage and water facilities;

"(F) A report on existing site conditions and a summary of conditions in the surrounding areas, showing the location and nature of existing buildings, existing street elevations, traffic patterns and character of open areas, including wetlands and flood plains, in the neighborhood;

"(G) A tabulation of proposed buildings by type, size (number of bedrooms, floor area) and ground coverage and a summary showing the percentage of the tract to be occupied by buildings, by parking and other paved vehicular areas and by open spaces;

"(H) A master plan, if the development proposal is for a major or minor land development plan or a major or minor subdivision;

"(I) [A] sample land lease or deed restrictions with affordability liens that will restrict use as low and moderate income housing units for a period of not less than thirty (30) years; and

"(J) The list of all persons entitled to notice in accordance with § 45–24–53." P.L. 2004, ch. 286, § 10 (codified as amended at § 45–53–6(f)(1)).[4]

Applications found to be substantially complete are subject to remand from SHAB to the respective zoning board for hearings pursuant to pre-moratorium standards. Section 45–53–6(f)(2)). Applications deemed not to have achieved substantial completeness must proceed under heightened procedural and density requirements applicable to post-moratorium

---

**3.** This section also allows SHAB to find a project substantially complete when a zoning board determines explicitly that the application is substantially complete. P.L. 2004, ch. 286, § 10 (codified as amended at § 45–53–6(f)(1)).

**4.** The original version of the public law listed the ten sub-elements as (i) through (x), while the current compiled version lists the sub-elements as (A) through (J), apparently due to a compiler's revision in 2004. We will refer to the sub-elements as (A) through (J) in hopes of avoiding unnecessary confusion.

projects. *Compare* P.L. 2004, ch. 3, § 1 (codified at § 45–53–4) *with* P.L. 2004, ch. 286, § 11 (codified at § 45–53–4(a)); *see also New Harbor Village, LLC v. Town of New Shoreham Zoning Board of Review,* 894 A.2d 901, 904 (R.I.2006).

## II

### Facts and Procedural History

The three projects at issue in this case were submitted by for-profit developers to the Town of Burrillville Zoning Board of Review (zoning board) shortly before the moratorium went into effect. On or about January 12, 2004, Crystal Lake filed a comprehensive permit application with the zoning board to build housing on 98.96 acres of vacant land composed of open fields, wooded uplands, and wooded wetlands. Crystal Lake proposed the construction of 174 units of two-bedroom townhouses and two- or three-bedroom detached homes, with 20 percent of the overall total reserved as low- or moderate-income housing. On or about January 16, 2004, Pascoag filed a comprehensive permit application with the zoning board to build fifty-six apartment units on 4.05 acres of vacant land. The application proposed seven buildings comprising eight units each, with 20 percent of the units reserved for people with low or moderate incomes. Finally, on or about January 22, 2004, East Avenue filed an application for a comprehensive permit seeking permission to build seventy-four single-family homes on 154.87 acres of vacant land. East Avenue also proposed to set aside 20 percent of the units for people with low or moderate incomes.

Pascoag, Crystal Lake, and East Avenue all agreed to waive the then-existing requirement in § 45–53–4 [5] that the zoning board hold a hearing within thirty days of the filing of a comprehensive permit application. Public hearings for each project were scheduled to begin on March 9, 2004. The moratorium went into effect in the interim, on February 13, 2004, after which the zoning board declined to proceed with the scheduled March 9 hearing.

On March 29, 2004, Pascoag, Crystal Lake, and East Avenue appealed from the zoning board to SHAB on identical grounds. Each appeal argued that the zoning board should have determined the applicability of the moratorium to their applications, as well as pass on questions relating to applicants' vested rights and equitable estoppel. SHAB addressed the three appeals at public meetings on March 30 and April 20, 2004, but did not take any significant action because it was aware that the General Assembly was considering proposed revisions to the act.[6]

On July 1, 2004, SHAB asked the zoning board to present its view on the substantial completeness of the three Burrillville applications. If the zoning board did not deem the applications substantially complete, SHAB requested that the zoning board specifically articulate the alleged deficiencies. In a letter dated July 28, 2004, the zoning board informed SHAB that it found none of the three applications substantially complete. The zoning board

---

5. The General Assembly rewrote § 45–53–4 after the February 13, 2004 moratorium went into effect. *Compare* P.L. 2004, ch. 3, § 1 (codified at § 45–53–4(a)) *with* P.L. 2004, ch. 286, § 11 (same).

6. As previously discussed, the General Assembly amended the act, effective July 2, 2004, to allow for-profit developers affected by the

moratorium to appeal to SHAB if they did not receive favorable treatment from local zoning boards of review. As long as a for-profit developer filed an appeal before August 1, 2004, the amendment required SHAB to determine the "substantial completeness" of the application as of February 13, 2004.

reached its conclusion by applying the ten factors set forth in § 45–53–6(f)(1)(i). Specifically, the zoning board found that all three projects failed § 45–53–6(f)(1)(i)(B), which relates to a written list of variances, special-use permits, and waivers, and § 45–53–6(f)(1)(i)(D), which enumerates evidence of eligibility for a state or federal government subsidy. The zoning board also found that Pascoag and Crystal Lake failed to demonstrate substantial completeness for site development plans as stipulated by § 45–53–6(f)(1)(i)(E). Finally, the zoning board determined that East Avenue also was incomplete with respect to § 45–53–6(f)(1)(i)(C), which relates to evidence of site control, and § 45–53–6(f)(1)(i)(J), for failing to provide a list of people entitled to notice of the proposed project.

On November 22, 2004, SHAB heard oral arguments on the three Burrillville projects. On December 8, 2004, SHAB held another hearing and determined that Pascoag, Crystal Lake, and East Avenue each had submitted a comprehensive permit application that was substantially complete as of February 13, 2004. Because the zoning board had not held a hearing with respect to any of the applications, SHAB did not address substantial completeness as defined by whether the zoning board acted in a manner demonstrating that it considered the application substantially complete. *See* § 45–53–6(f)(1)(ii). Instead, SHAB reached its conclusion in each case by applying the factors set forth in § 45–53–6(f)(1)(i)(A) through (J). SHAB issued short written orders primarily because SHAB had a limited amount of time to issue written orders for the nineteen "substantial completeness" appeals then before it.[7] On December 29, 2004, SHAB issued identical orders for Pascoag, Crystal Lake, and East Avenue that each stated in pertinent part, "Based on SHAB's review of the administrative record, the parties' filings on appeal and their oral arguments and for reasons stated during its deliberations, SHAB adopted unanimously the following finding: The application for a comprehensive permit is substantially complete of substantially all of the elements delineated in § 4[5]–53–6(f)(1)(i)[ ][A–J]."[8] SHAB remanded each application to the zoning board and ordered it to proceed with hearings in compliance with § 45–53–6(f)(2).

On January 27, 2005, the Town of Burrillville (town) petitioned this Court for issuance of a writ of certiorari to review SHAB's substantial-completeness determination for the Pascoag, Crystal Lake, and East Avenue projects. The town also moved to stay the enforcement of SHAB's December 29, 2004 orders. On January 28, 2005, this Court ordered a temporary stay while we considered the writ of certiorari and the motion for stay. On February 11, 2005, we granted the writ of certiorari and continued the stay. Our February 11 order noted that SHAB failed to buttress its rulings in the three cases with appropriate findings of fact and conclusions of law. Accordingly, we remanded the case to SHAB and ordered it to make factual findings and legal conclusions, and to transmit the record to us thereafter. *See Kaveny v. Town of Cumberland Zoning Board of Review,* 875

---

**7.** Section 45–53–6(f)(1) did not allow SHAB to decide appeals from private developers for substantial-completeness determinations until December 1, 2004, and the General Assembly reconstituted SHAB's membership effective January 1, 2005, thus providing the SHAB board as it stood in December 2004 with a limited amount of time to issue written decisions. *See* § 45–53–7.

**8.** The three orders later were amended *nunc pro tunc* to correct a citation error.

A.2d 1, 9 (R.I.2005) (remanding to SHAB and directing it to "take care that its findings of fact are clearly set forth in its decision, referring to the evidence presented, and that its conclusions of law are properly supported by the findings of fact").

As mentioned above, the General Assembly changed SHAB's membership, effective January 1, 2005. *See* P.L. 2004, ch. 286, § 12 (codified as amended at § 45–53–7(a)(i)). On September 19, 2005, the reconstituted SHAB membership held a hearing and reconsidered the Pascoag, Crystal Lake, and East Avenue projects. SHAB determined, relying upon *Coderre v. Zoning Board of Review of Pawtucket*, 103 R.I. 575, 577–78, 239 A.2d 729, 730 (1968),[9] that it could not take its December 8, 2004 deliberations into account because SHAB's membership had changed on January 1, 2005. Therefore, SHAB proceeded to hear detailed oral arguments in each of the three appeals and deliberated *de novo* in each case. The town raised many of the same arguments that appeared in the zoning board's July 28, 2004 letter to SHAB. After review of each case, SHAB again found that each project was substantially complete as of February 13, 2004, by applying the ten-factor list in § 45–53–6(f)(1)(i), and it remanded the applications to the zoning board for further proceedings.[10]

On October 17, 2005, SHAB issued written decisions for the Pascoag, Crystal Lake, and East Avenue projects, and the administrative record was returned to this Court thereafter. On November 28, 2005, the town filed a pre-briefing statement under Article I, Rule 12A of the Supreme Court Rules of Appellate Procedure. For reasons that do not appear in the record, Pascoag, Crystal Lake, and East Avenue did not file timely responses.[11] On February 16, 2007, the clerk of this Court entered an order defaulting them for failing to file a timely Rule 12A statement, "provided, however, if the pre-briefing statement is filed on or before F[ebruary] 26, 2007 this Order shall be vacated." Pascoag, Crystal Lake, and East Avenue filed the required statement on February 26, 2007, and the case was argued before this Court on March 6, 2008. Additional facts will be supplied as needed.

## III

### Standard of Review

 Our previous cases explain that "[t]his Court employs a deferential standard when reviewing a SHAB decision * * *. * * * 'A SHAB decision may be reversed by this Court if it violates constitutional or statutory provisions, was made in excess of statutory authority or upon error of law, or was otherwise clearly erroneous in view of the evidence or was other-

9. In that case, this Court explained "that where there has been a change in the composition of a board of review made subsequent to the rendering of a decision which this [C]ourt remands for clarification, completion and/or supplementation of the record on which the decision was based, a hearing de novo on the application for relief is a jurisdictional condition precedent to a valid decision." *Coderre v. Zoning Board of Review of Pawtucket*, 103 R.I. 575, 577–78, 239 A.2d 729, 730 (1968).

10. On September 19, 2005, SHAB voted also that the town did not treat any of the comprehensive-permit applications as if they were substantially complete, thus rendering § 45–53–6(f)(1)(ii) inapplicable. Pascoag, East Avenue, and Crystal Lake do not contest this particular finding on appeal.

11. At oral argument, Pascoag, Crystal Lake, and East Avenue represented to this Court that they did not file a pre-briefing statement because they were in negotiations with the town over the advancement of the three projects.

wise arbitrary or capricious.'" *Town of Smithfield,* 924 A.2d at 800 (quoting *West Reservoir, LLC v. Smithfield Zoning Board of Review,* 884 A.2d 977, 978 (R.I. 2005) (mem.)). "And because we review this case under writ of certiorari, we also are mindful that '[o]n certiorari, this Court must "scrutinize the record as a whole to determine whether legally competent evidence exists to support the findings of the court below."'" *Id.* (quoting *Mill Realty Associates v. Crowe,* 841 A.2d 668, 672 (R.I.2004)). Legally competent evidence is "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance." *Id.* at 806 (quoting *Foster–Glocester Regional School Committee v. Board of Review,* 854 A.2d 1008, 1012 (R.I.2004)).

## IV

### Discussion

The town advances two arguments before this Court. First, the town alleges that SHAB erred in formulating its standard of review for substantial completeness by looking beyond the submitted application materials and concluding there was sufficient information to conduct a "meaningful review" or to "get started." Second, the town argues that "material deficiencies" in the three applications demonstrate that SHAB erred in finding each of them substantially complete.

### A

#### 1. The Elusive Definition of Substantial Completeness

The parties in this case offer differing views on whether SHAB correctly interpreted the meaning of "substantial completeness" in § 45–53–6(f)(1)(i). This Court has said that "[a]lthough § 45–53–6(f)(1)(i) fails (or, perhaps more accurately, does not even attempt) to define 'substantial completeness' in any meaningful way, it does succeed in unequivocally establishing that information that was not included in an application prior to February 13, 2004, is excluded from SHAB's review." *Town of Smithfield,* 924 A.2d at 801–02. In *Town of Smithfield,* we held that SHAB committed an error of law when it considered information that came into existence after the developer's application was frozen in time on February 13, 2004, for the purposes of determining substantial completeness. *Id.* at 802, 804.

In this case, the town alleges that SHAB committed a similar error by reviewing "the determination of substantial completeness in the context of whether or not there would be an opportunity to continue to complete the materials in the course and conduct of a [future] hearing." The town alleges that if "the legislature had wanted [SHAB] to inquire as to whether there was enough to proceed forward with additional information being supplemented at the hearing stage, it would have put such language into Section 45–53–6(f)(1)." The town points to part of SHAB's deliberations on September 19, 2005, when one of SHAB's members objected to the level of detail the town demanded from Pascoag, and stated, "I see th[e] issue as, is there enough information on this plan for the town at least to let the person get before a board so they can start to work on these issues. That is how it is." The town contends that SHAB's approach amounts to an impermissible standard of review for determining substantial completeness because the "one stop shopping" permitted under § 45–53–4 requires applicants to submit complete information and relatively finite plans for the town to review. In the town's view, SHAB could reach a determination of substantial completeness only by finding that an application was substantial-

ly complete with respect to each of the ten factors listed in § 45–53–6(f)(1)(i).

In response, Pascoag, Crystal Lake, and East Avenue concede that SHAB members used "phraseology" such as "determining that there was sufficient information to conduct 'meaningful review' or at least to 'get started'" during SHAB's September 19, 2005 hearing on the three applications. Nevertheless, respondents argue that SHAB's October 17, 2005 written decisions for the three projects include findings of fact and conclusions of law demonstrating that SHAB made a determination that thorough and complete application materials existed that warranted a finding of substantial completeness under § 45–53–6(f)(1)(i). Accordingly, respondents allege that SHAB's interpretation of substantial completeness in its written decisions does not constitute an error of law.

Pascoag, Crystal Lake, and East Avenue argue that SHAB correctly interpreted the meaning of "substantially complete." Relying upon principles of administrative law, respondents contend that substantial completeness is an ambiguous term and that SHAB's interpretation deserves deference from this Court. In respondents' view, requiring full compliance for each of the ten elements in § 45–53–6(f)(1)(i) would render substantial completeness a meaningless term, violate the canons of statutory construction, and defeat the Legislature's intent to grandfather eligible housing projects under pre-moratorium standards.

Questions of statutory construction are subject to *de novo* review by this Court, and we are the final arbiter on such questions. *Unistrut Corp. v. State Department of Labor and Training*, 922 A.2d 93, 98 (R.I.2007). "When a statute is clear and unambiguous we are bound to ascribe the plain and ordinary meaning of the words of the statute and our inquiry is at an end." *Id.* (citing *Moore v. Ballard*, 914 A.2d 487, 490 (R.I.2007)). "However, when a statute is susceptible of more than one meaning, we employ our well-established maxims of statutory construction in an effort to glean the intent of the Legislature." *Id.* at 98–99 (citing *Tanner v. Town Council of East Greenwich*, 880 A.2d 784, 796 (R.I.2005)).

Our well-established maxims of statutory construction include specific rules in the realm of administrative law.[12] "Although this Court is the final arbiter of questions of statutory construction, it is also true that 'we give deference to an agency's interpretation of an ambiguous statute that it has been charged with administering and enforcing, provided that the agency's construction is neither clearly erroneous nor unauthorized.'" *Rossi v. Employees' Retirement System*, 895 A.2d 106, 113 (R.I.2006) (quoting *Arnold v. Rhode Island Department of Labor and Training Board of Review*, 822 A.2d 164, 169 (R.I.2003)); *cf. United States v. Mead Corp.*, 533 U.S. 218, 229, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (granting deference to agency interpretation of an ambiguous statute when Congress contemplates administrative action with the effect of law).[13] The interpretation of a statute by

---

**12.** As this opinion, and our other decisions involving SHAB demonstrate, Justice Scalia was quite prescient when he commented that "[a]dministrative law is not for sissies * * *." Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 Duke L.J. 511, 511 (1989).

**13.** In cases in which the General Assembly does not contemplate administrative action with the force and effect of law, this Court will not presume deference to an agency's interpretation of an ambiguous term and may substitute its own judgment for that of the administrative agency. *See Great American Nursing Centers, Inc. v. Norberg*, 567 A.2d 354,

the administering agency is not controlling, but it is entitled to great weight. *State v. Swindell,* 895 A.2d 100, 104 (R.I. 2006). This Court will accord such deference "even when the agency's interpretation is not the only permissible interpretation that could be applied." *Murray v. McWalters,* 868 A.2d 659, 662 (R.I.2005) (quoting *Pawtucket Power Associates Limited Partnership v. City of Pawtucket,* 622 A.2d 452, 456–57 (R.I.1993)). Nevertheless, our interpretation of an ambiguous statute "is grounded in policy considerations and we will not apply a statute in a manner that will defeat its underlying purpose." *Arnold,* 822 A.2d at 169; *see also Parkway Towers Associates v. Godfrey,* 688 A.2d 1289, 1293–94 (R.I.1997) ("administrative interpretation is entitled to great deference * * * when * * * it is consistent with the overall purposes of the legislation"). Further, "the true measure of a court's willingness to defer to an agency's interpretation of a statute 'depends, in the last analysis, on the persuasiveness of the interpretation, given all the attendant circumstances.'" *Unistrut Corp.,* 922 A.2d at 101 (quoting *United States v. 29 Cartons of * * * an Article of Food,* 987 F.2d 33, 38 (1st Cir.1993)).

We conclude that in this context "substantial completeness" is an ambiguous statutory term. "The pragmatic checklist in § 45–53–6(f)(1)(i)(A) through (J) establishes a seemingly precise scorecard that, at first glance, would appear to reduce SHAB's evaluations to a rote exercise in inventory accounting, but the lack of a satisfactory explication of the determinative standard undermines the objectivity of the process." *Town of Smithfield,* 924 A.2d at 801. At best, § 45–53–6(f)(1)(i) is

a tautology that defines substantial completeness as substantial completeness of substantially all of the ten-factor checklist in the statute. In mathematical terms, the definition constitutes a 720–degree turn, or two full revolutions around the substantial completeness circle. As we noted, "[s]uch circular language renders the statute susceptible to any number of potential interpretations * * *." *Town of Smithfield,* 924 A.2d at 801. Substantial completeness, therefore, falls easily within our standard for ambiguous statutory terms.

Section 45–53–6(f)(1)(i) directs SHAB to make "[t]he determination of substantial completeness * * * on whether there was on or before February 13, 2004, substantial completeness of substantially all of the" ten factors listed in the statute. SHAB was required to determine the substantial completeness of appealed applications and then remand applications found to be substantially complete to local zoning boards. Section 45–53–6(f)(1)–(2). Thus, SHAB is clearly the agency "charged with administering and enforcing" the fate of pre-moratorium comprehensive permit applications that appear before it on appeal. This Court will thus afford a presumption of deference to SHAB's interpretation of the phrase "substantial completeness." It is an ambiguous statutory phrase and the General Assembly charged SHAB with its administration in the context of appeals of comprehensive permit applications from the actions of local zoning boards. In this case, as in *Town of Smithfield,* 924 A.2d at 801, SHAB's members did not adopt a definition of substantial completeness at the September 19, 2005 hearing when SHAB voted on the three projects.[14]

356–57 (R.I.1989); *Lerner v. Gill,* 463 A.2d 1352, 1358 (R.I.1983); *see also United States v. Mead Corp.,* 533 U.S. 218, 227–31, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *Skidmore*

*v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

**14.** SHAB's counsel suggested the definition that appeared in its subsequent written deci-

SHAB's October 17, 2005 written decisions, however, set forth a working definition of substantial completeness. Using an "ordinary and plain meaning" standard, SHAB defined "substantial" to mean "material," "important," and "essential," and the term "complete" to mean "having all parts or elements." [15] In our opinion, SHAB's definition is entitled to deference, provided it "is neither clearly erroneous nor unauthorized." *Rossi*, 895 A.2d at 113.

## 2. The Purpose of the Moratorium

Our analysis in this regard is informed by the language employed by the General Assembly and by the clear purpose it manifested when it imposed the moratorium on comprehensive permit applications by for-profit developers. The General Assembly specifically found that in January 2004 zoning boards of review were "confronted by an unprecedented volume and complexity of development applications as a result of private for-profit developers using the [Low and Moderate Income Housing Act] * * *." Section 45–53–4(b)(1); *see also Town of Smithfield*, 924 A.2d at 808 (explaining that before the moratorium, zoning boards of review were "swimming in an ocean of applications"). Accordingly, the General Assembly forcefully declared that it was necessary to impose a moratorium "to protect the public health and welfare in communities." Section 45–53–4(b)(1). Significantly, the General Assembly did not prohibit permanently the use of comprehensive permit applications by for-profit developers; rather, it imposed a moratorium, a postponement or temporary suspension "to provide sufficient time to establish a reasonable and orderly process for the consideration of applications * * *, and to have communities prepare plans to meet low and moderate income housing goals." Section 45–53–4(b)(1). "This clear statement of statutory purpose underscores the significance of the February 13, 2004 deadline" that marked the beginning of the moratorium. *Town of Smithfield*, 924 A.2d at 805.

The amendment to the act that authorized SHAB to determine the substantial completeness of comprehensive permit applications as of February 13, 2004, also spoke with a clear legislative intent.

"The obvious purpose of this subsection was to cull out eleventh-hour applications that were completed and filed hastily to avoid the well-publicized impending moratorium for all comprehensive permit applications submitted by for-profit developers. A SHAB determination under this subsection dictates whether an application will proceed under the pre-moratorium or post-moratorium permit review procedure. It is not a decision on the merits." *New Harbor Village, LLC*, 894 A.2d at 909.

The General Assembly's purposes in imposing the moratorium and subse-

---

sions during the September 19, 2005 hearing, but the board neither voted on the definition nor adopted it at the hearing. In December 2004, during SHAB's original deliberations on the three projects, SHAB recognized explicitly that no working definition of substantial completeness existed. On December 8, 2004, SHAB's counsel suggested the following definition:

"We need to look at each of the ten items and determine not only if each one is substantially complete, but in the aggregate, have substantially all of the following been

met. So, it is a double-pronged analysis of substantial completion, and then globally, have the issues been substantially complied with to allow a meaningful review at the zoning board level."

**15.** SHAB's October 17, 2005 written decisions adopted the definition of substantial completeness set forth in *Town of Scituate v. EFC Construction*, C.A. No. PC 04–912, 2005 WL 524805 (R.I.Super. Ct. filed March 3, 2005).

quently enacting the amendment for well-developed comprehensive permit applications provides the landscape for our review of SHAB's interpretation of substantial completeness. We conclude that SHAB's definition of "substantial" to mean "material," "important," and "essential," and the term "complete" to mean "having all parts or elements," warrants deference from this Court. SHAB's interpretation of substantial completeness is a reasonable definition that easily comports with the legislative purposes of the act. SHAB's definition makes clear that eleventh-hour comprehensive permit applications that were filed hastily are unlikely to be complete or to have all the necessary parts or elements to achieve substantial completeness. Further, given the General Assembly's interest in protecting the public health and welfare, SHAB's requirement that comprehensive permit applications include material, important, and essential components ensures that only those projects that give municipalities a comprehensive framework of the proposed housing development can proceed under pre-moratorium standards. Such "completeness" is necessary to meet the strict timelines required by the streamlined application process. Under these circumstances, SHAB's definition of substantial completeness is neither clearly erroneous nor unauthorized, and this Court will not substitute its judgment for that of the agency.

Were this the end of the story, this Court would affirm SHAB's written decisions and order that the three projects continue their journey through the approval process under pre-moratorium standards. A review of SHAB's September 19, 2005 hearing and its October 17, 2005 written decisions, however, reveals that SHAB misapplied its own definition in deciding the substantial completeness of the comprehensive permit applications submitted by Pascoag, Crystal Lake, and East Avenue. SHAB's decision-making focused upon sufficiency rather than substantial completeness, and it repeatedly considered whether the applications contained enough information for the town to "get started."

### 3. The SHAB Decisions

SHAB's written decisions for Pascoag, Crystal Lake, and East Avenue each conclude that the applications contained ample information to allow the parties to proceed with meaningful evidentiary hearings. In Pascoag's case, SHAB was "convinced that Pascoag placed considerable time and effort into the drafting of its Application." One of the primary disputes in the case centered around the type and detail of waivers and variances required for the project. SHAB found that Pascoag "sufficiently identified its requested relief," and reasoned that "any * * * disputes regarding the scope of required relief are proper topics for evidentiary development during the Zoning Board's hearings on remand." Similarly, with respect to site development plans, SHAB determined that "Pascoag has presented sufficiently detailed drawings and data to place the Zoning Board on notice" and that "landscaping and drainage issues may be properly addressed as more advanced engineering data is produced later in the zoning process." SHAB also noted that the "Zoning Board has acknowledged that Pascoag provided sufficient information as to seven of the ten elements in § 45–53–6(f)(1)(i)(A–J)." SHAB reasoned that the seven stipulated elements were arguably sufficient on their own to satisfy substantial completeness. Regardless, SHAB concluded that Pascoag's application contained sufficient information for the three disputed elements, and that therefore the application was substantially complete.

SHAB's written decisions for the Crystal Lake and East Avenue projects employ

similar language and methodology as in the Pascoag written decision. With respect to Crystal Lake and East Avenue, as in the Pascoag case, SHAB noted that the zoning board did not dispute the sufficiency of six or seven of the elements of the ten-factor checklist in § 45–53–6(f)(1)(i). As in the Pascoag written decision, SHAB was "convinced" that East Avenue and Crystal Lake spent considerable time and effort in drafting their applications. The Crystal Lake and East Avenue written decisions both posit that the scope of applicable relief for disputed waivers and variances could be refined and resolved fully at evidentiary hearings on remand. Concerning the Crystal Lake project, SHAB determined that a site development plan issue involving a sewer easement could be addressed at evidentiary hearings on remand before the zoning board. With respect to East Avenue, SHAB minimized the developer's failure to include an abutters list, finding that it could be submitted properly at the outset of the remanded evidentiary hearings before the zoning board. SHAB determined that the omission of the abutters list "is not fatal to the determination of the substantial completeness of East Avenue's Application." SHAB concluded in the East Avenue and Crystal Lake written decisions that six or seven stipulated elements arguably were sufficient on their own to satisfy substantial completeness. Moreover, SHAB concluded that East Avenue and Crystal Lake's applications contained sufficient information for the remaining three or four disputed elements, and that therefore their applications were substantially complete.

█ SHAB's three written decisions speak primarily of sufficiency, and they rationalize that any alleged deficiencies can be cleaned up on remand in front of the zoning board. This approach contravenes the very definition SHAB laid out for itself. SHAB's definition makes clear that comprehensive permit applicants must do more than submit "sufficient" information that merely puts the zoning board "on notice" of potential problems to be solved on remand to the zoning board.

More fundamentally, a review of the September 19, 2005 hearing reveals that SHAB did not apply the substantial-completeness standard set forth in its October 17, 2005 written decisions. Each written decision contains language similar to "By a 5–0 vote, SHAB concluded that the Application was, as of February 13, 2004, substantially complete as to substantially all of the ten elements delineated in § 45–53–6(f)(1)(i)(A–J) * * *." The written decisions, however, do not expound upon SHAB's deliberations at the hearing that led to the unanimous vote for each project.

SHAB's members applied a low standard when they considered and voted on the Pascoag, Crystal Lake, and East Avenue comprehensive permit applications at the September 19, 2005 hearing. With respect to Pascoag, the following colloquy occurred between the board members:

"MR. GOODRICH: [The town is] looking for drainage calculations. They want an architect to give a soil erosion information control plan, they gave buildings, they're asking for things at this stage of development which I think you don't get until you sit down with the board and say, we're not going to have a building over here in the northwest corner that is going to change the drainage calculation, or we're going to move this road here. This is what towns do. How anyone can ask someone for a drainage calculation when we don't know what is going to be built, or what is going to get developed and what is going to end up being built is putting the cart before the horse. I see this issue as, is there enough information on this plan for the

town at least to let the person get before a board so they can start to work on these issues. That is how it is.

"MR. MAYNARD: I think that is how we saw it last year."

Further, a SHAB member supported a finding of substantial completeness for § 45–53–6(f)(1)(i)(B) based on the position that "there was certainly enough information there to give the town some idea as to what was being proposed." Turning to § 45–53–6(f)(1)(i)(E), a similar colloquy occurred between the board members:

"MR. GOODRICH: We're not looking at the plans. We have them here if we want to look at them. It's clear to me that there is definitely location of buildings, there is dimensions, there are streets and drives, there are parking lots. Maybe they're not done to the specificity that they're requiring, but you certainly can determine where these buildings are and where they're supposed to go. Again, it's enough for a developer, in my mind, to have a town start working on a project, and, again, those roads, those buildings, those parking areas are all going to probably change, if I know the way towns are, because towns like doing it their way. I think it would be foolhardy and crazy and expensive for someone to give you a full set of plans when in fact you have no idea if you're going to build five units or fifty units. I find that substantially complete.

"MR. MAYNARD: I second that."

SHAB considered the Pascoag application first at the September 19, 2005 hearing. After SHAB discussed and voted on the Pascoag application, less discussion ensued concerning the Crystal Lake and East Avenue applications. With respect to Crystal Lake and § 45–53–6(f)(1)(i)(B), a SHAB member again commented that "I think there is definitely enough informa-

tion that it's substantially complete and looking at this proposal they could start working with the developer and moving it forward. I make that in the form of a motion." Another SHAB member seconded the motion and SHAB passed it unanimously. Turning to the East Avenue project and the issue of lack of an abutters list as required by § 45–53–6(f)(1)(i)(J), the following colloquy occurred between the board members:

"[SHAB CHAIR]: I had asked [SHAB's counsel] a question specifically during the oral argument, I guess it wasn't submitted at the time because [East Avenue's attorney] hadn't had an actual date, but he did indicate, as he does in his brief, or his memorandum, that a radius map was actually submitted as part of the application. So I think the information is necessary.

"MR. MAYNARD: It's a question of timing.

"MR. GOODRICH: 'We have nine of the ten items, and I have one you didn't do. I got you.' I don't think so, because I don't think that is the American way, and I think that if obviously this ever got set down for a public hearing that he would have to make a list of abutters. As the Chairperson just referred to, from looking at the plan right here, I see the names of all the people that abutted, the people here and people there. They didn't tell us that Adam and Joe Pesto live nearby, he didn't. Is it typed on a nice abutters list? No, I don't think so, but I think it's substantially complete."

SHAB subsequently voted to find the application substantially complete, despite the lack of an abutters list.

SHAB discussions at the September 19 hearing demonstrate that it framed substantial completeness as whether the developers provided enough information for

the town to "start to work" on the issues and whether the applications gave the town "some idea as to what was being proposed." SHAB recognized that the developers' plans were "going to probably change," and considered whether "there is definitely enough information that it's substantially complete and looking at this proposal they could start working with the developer and moving it forward."

Applying SHAB's adopted substantial-completeness definition set forth in its written decisions, this Court fails to see how an application can have "all parts or elements" that are "material," "important," and "essential" when SHAB's review takes into account merely whether the town has "some idea" of a development proposal that is "going to probably change." Further, it is evident that SHAB's East Avenue vote does not comport with its adopted definition considering the lack of an abutters list as specified in § 45–53–6(f)(1)(i)(J). *Cf. Town of Smithfield,* 924 A.2d at 804 ("We are hard-pressed, however, to fathom the complete disregard of the plain language of a statutory provision. Section 45–53–6(f)(1)(i)(H) requires '[a] master plan' * * *.").

■■■ SHAB's failure to follow its own definition falls within the realm of reversible error. We have held that "[a]n agency is bound, of course, by its own regulations." *Arnold v. Lebel,* 941 A.2d 813, 821 n. 2 (R.I.2007). This familiar rule of administrative law does not apply in this case, however, because SHAB did not promulgate a regulation to define substantial completeness; rather, it defined the term through the adjudication of three contested comprehensive permit applications. We must look, therefore, to the general principles of administrative law for adjudicative rulemaking. It is a "'simple but fundamental rule of administrative law'" that an "agency must set forth clearly the

grounds on which it acted." *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)). In the context of adjudication, a presumption exists that an agency will adhere to its settled rule, and the agency must explain a departure from its prior norms. *Atchison,* 412 U.S. at 808, 93 S.Ct. 2367. The grounds for departure from the settled rule "must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate." *Id.* In this case, SHAB announced a definition for substantial completeness in its written decisions that it had failed to apply during its deliberations or votes on the three applications. SHAB offered no reasoning or explanation for its departure. Accordingly, we conclude that SHAB acted in an arbitrary and capricious manner when its actions did not comport with its own definition of substantial completeness.

**B**

**1. Substantial Completeness as Applied to Pascoag, Crystal Lake, and East Avenue**

The town's second argument alleges that SHAB's determinations of substantial completeness for the Pascoag, Crystal Lake, and East Avenue projects all were clearly erroneous. The town points to alleged deficiencies in each of the applications that it contends demonstrate that SHAB erred in finding substantial completeness. The town contends that SHAB committed an error of law by finding substantial completeness when each project lacked key elements with respect to several of the ten factors enumerated in § 45–53–6(f)(1)(i). The respondents counter that the alleged

deficiencies in each of the applications do not defeat SHAB's findings of substantial completeness. The respondents argue that the large amount of information in the comprehensive permit applications, and the fact that six or seven of the factors listed in § 45–53–6(f)(1)(i) were not alleged to be incomplete in any way, demonstrate that the alleged shortcomings in each application constitute minor deficiencies.

This Court remains cognizant of the purposes and structure of the Low and Moderate Income Housing Act. As previously noted, the General Assembly imposed the moratorium on for-profit comprehensive permits "to protect the public health and welfare in communities and to provide sufficient time to establish a reasonable and orderly process for the consideration of [comprehensive permit] applications" made by for-profit developers, and to "have communities prepare plans to meet low and moderate income housing goals." Section 45–53–4(b)(1). Further, the amendment to the act that allowed comprehensive permit applications deemed substantially complete to move forward had the "obvious purpose * * * to cull out eleventh-hour applications that were completed and filed hastily to avoid the well-publicized impending moratorium." *New Harbor Village, LLC,* 894 A.2d at 909. We are also mindful that municipalities faced a Hobson's choice in the context of comprehensive permit applications before the moratorium went into effect. *Town of Smithfield,* 924 A.2d at 807. If a zoning board delayed hearings, the developer had the right to appeal to SHAB, at which point SHAB would have "the power to usurp the zoning board's control over the review process and approve the comprehensive permits by itself." *Id.* Before the moratorium went into effect, therefore, municipalities faced a risk of completely losing control over projects that would have significant impacts on their communities, or they could

proceed forward with the expedited review allowed for comprehensive permitting applications. *Id.*

It also bears repeating that a determination of substantial completeness is not a determination on the merits; rather, such a finding dictates whether the application will proceed under pre-moratorium or post-moratorium standards. *See New Harbor Village, LLC,* 894 A.2d at 909. Applicants that were denied a finding of substantial completeness as of February 13, 2004, are free to resubmit their permit applications under post-moratorium standards. *See generally* § 45–53–4. Under § 45–53–4(b), the moratorium on applications by for-profit developers lasted from February 13, 2004, until January 31, 2005. Section 45–53–4(b) allows for-profit developers to submit new comprehensive permit applications to municipalities after July 1, 2005, or October 1, 2005, depending upon the municipality's alacrity in developing a comprehensive plan for low- and moderate-income housing.

### a. Pascoag

■ The town alleges that Pascoag failed to provide sufficient information for a finding of substantial completeness for three of the ten factors enumerated in § 45–53–6(f)(1)(i). In the town's view, the lack of information created a material deficiency in the application such that it could not be considered substantially complete.

The town first contends that SHAB erred in considering § 45–53–6(f)(1)(i)(B), which requires review of a "written list of variances, special use permits and waivers requested to local requirements and regulations, including local codes, ordinances, by-laws or regulations, including any requested waivers from the land development or subdivision regulations, and a proposed timetable for completion of the project." The town lists a litany of waiv-

ers that it says applies to the project that Pascoag failed to mention in its comprehensive permit application, including relief or variances for zoning and regulations relating to: maximum heights of structures, structural density, off-street parking and loading and on-street parking, land development review, multiunit dwellings, rubbish disposal, waiver of fees, preservation of rock outcrops and ridgelines, steep slopes, stormwater management, drainage calculations, building design, lot design standards for site distance, soil erosion, landscaping, and special grading provisions. The town also contends that a proposed timetable for the project was not submitted, except for the general statement that "construction is expected to commence in later 2004 and continue at a pace dictated by market conditions."

The town next alleges that Pascoag failed to provide "[e]vidence of eligibility for a state or federal government subsidy, including a letter from the funding agency indicating the applicant and the project," as stated by § 45–53–6(f)(1)(i)(D). The town argues that the letter submitted by Pascoag from Rhode Island Housing and Mortgage Finance Corporation (RIHMFC) referred to "Granite Ridge," and did not mention Pascoag as the project proponent.

Finally, the town alleges Pascoag failed to meet substantial completeness for § 45–53–6(f)(1)(i)(E), which pertains to "[s]ite development plans showing the locations and outlines of proposed buildings; the proposed location, general dimensions and materials for streets, drives, parking areas, walks and paved areas; proposed landscaping improvements and open areas within the site; and the proposed location and types of sewage, drainage and water facilities." In this category, the town contends that Pascoag is deficient in several different ways: the outlines of the pro-

posed building were different from the proposed building plans; no plans existed for sewer, water, or drainage facilities; there was no landscaping plan or a plan for sidewalks; the submitted plan did not include an explanation for siting buildings and parking facilities with substantial elevation changes; the right-of-way notes were inconsistent with the submitted drawings; and, finally, the submitted plan referred to land and development regulations that either were incorrect or did not exist.

The town also notes that SHAB's internal "Substantial Completeness Review Checklist" for the Pascoag project indicated that several substantial completeness elements were not adequate as of February 13, 2004. SHAB's internal review noted that Pascoag was not substantially complete relative to: site control, a timetable for the project, a proposed location for sewage, drainage, and water, proposed locations for landscaping improvements and open-space areas, reports on existing conditions for the character of open areas and wetlands, and the master plan with respect to topography and open-space use. The internal review also listed partial completeness for Pascoag's submission of variances, special-use permits and waivers, its submission for the general dimensions of streets and other paved areas, its report on existing conditions for the location and nature of existing buildings, and the master plan with respect to slope areas and rock outcroppings.

SHAB's October 17, 2005 written decision on the Pascoag project contains reasoning for its substantial completeness determination. With respect to the completeness of the requested waivers, variances, and exceptions, SHAB noted that Pascoag submitted a list of waivers in its comprehensive permit application, and that it provided a separate "Waiver List"

prepared by an engineering firm. SHAB concluded that "Pascoag has sufficiently identified its requested relief from the dimensional requirements of the Zoning Ordinance" and the contested items "are clearly identified on pages 4–5 of the Application and in the separate 'Waiver List' provided by" the engineering firm. SHAB noted further that the parties disputed whether a parking waiver was required, and commented that "SHAB believes this particular issue and any other disputes regarding the scope of required relief are proper topics for evidentiary development during the Zoning Board's hearings on remand."

SHAB also reviewed the sufficiency of the letter from RIHMFC. SHAB found that the letter attached to Pascoag's application was consistent in form and content compared to other letters that SHAB had accepted over the last several years. SHAB further determined that the fact that Pascoag was not identified by name was not a material issue and that the letter clearly related to Pascoag's proposed project. SHAB concluded that the zoning board had raised an unduly narrow and unpersuasive objection to the letter. Turning to the site development plans, SHAB's written decision listed the project plans, architectural plans, and architectural data submitted with the comprehensive permit application, including maps, existing condition and concept plans, and numerical acreage data. SHAB determined that the submitted materials "sufficiently show the proposed buildings, driveways, roads, parking areas, detention pond, open areas, and sewer and water lines" and that "Pascoag has presented sufficiently detailed drawings and data to place the Zoning Board on notice regarding the material site development issues." SHAB acknowledged that Pascoag would have to provide landscape plans and drainage calculations in future zoning hearings, but stated that

"SHAB agrees with Pascoag's representation that the landscaping and drainage issues may be properly addressed as more advanced engineering data is produced later in the zoning process."

SHAB summarized its findings about substantial completeness and the Pascoag project in the following manner:

"[T]he Zoning Board has acknowledged that Pascoag provided sufficient information as to seven of the ten elements in § 45–53–6(f)(1)(i)(A–J). These seven stipulated elements alone arguably may be sufficient to deem Pascoag's Application to be substantially complete. Regardless, Pascoag's Application also contains sufficient information regarding the three disputed elements. SHAB is convinced that Pascoag placed considerable time and effort into the drafting of its Application. Reviewing the Application in its entirety, there is ample information to allow the parties to proceed with meaningful evidentiary hearings addressing its merits."

We disagree with SHAB's finding that the Pascoag project was substantially complete. This Court is unable to conclude that legally competent evidence exists in the record in light of SHAB's adopted definition of substantial completeness. Although Pascoag's comprehensive permit application contained several pages of information, engineering reports, and a few large maps, the submission as a whole hardly can be said to attain substantial completeness, defined by SHAB as "having all parts or elements" that are "material," "important," and "essential."

The comprehensive permit application did not include adequate information on drainage, stormwater runoff, and elevation plans. According to Pascoag, the proposed site for the project consisted of "moderately rolling topography." We

view this description with some doubt, given that SHAB's own internal review stated that "extreme slopes [and a] ledge exist on site." A cursory review of the "existing conditions plan" map submitted with the application reveals that elevation for the site fluctuated between 470 and 520 feet. Nevertheless, we are unable to locate any discussion in the application relating to an elevation plan for the site. Indeed, SHAB's own internal review of the project noted that the submitted master plan did not contain topography at two-foot intervals, and that the master plan reached only partial compliance for delineating areas of greater than 15 percent slope and rock outcroppings. With respect to stormwater runoff and drainage, the application identifies the type of soil on site and the flood zone, but it provides no indication on how these issues would be impacted by the proposed buildings, pavement, and other improvements to the site. A minimal discussion of stormwater runoff and drainage for a "moderately rolling" site with seven large buildings seems to this Court to be a material, important, and essential element of a comprehensive permit application.

Further, it is clear to us that SHAB's conclusion that Pascoag had "presented sufficiently detailed drawings and data to place the Zoning Board on notice regarding the material site and development issues" does not comport with its own definition of substantial completeness.

A review of the September 19, 2005 SHAB hearing reveals SHAB's flawed application of its own substantial-completeness standard. In discussing Pascoag's application, various SHAB members commented: "they're a work in progress, you have an opportunity to continue to complete"; "there was certainly enough information there to give the town some idea as to what was being proposed"; and "[i]t's my feeling certainly there is enough there

that he should have at least got up to the plate."

### b. Crystal Lake

■ The town alleges that Crystal Lake failed to provide adequate information for a finding of substantial completeness for the same three factors enumerated in § 45–53–6(f)(1)(i) as in the Pascoag project. The town first points to § 45–53–6(f)(1)(i)(B) and lists a variety of alleged deficiencies with respect to variances, special-use permits, and waivers. The town notes that the property is located in an aquifer overlay zone and asserts that no "substantive mention or treatment of this was highlighted in the application's requested waivers." In the town's view, the application was "substantially insufficient to fulfill the minimum requirements for identification of waivers and other necessary relief." The town argues that Crystal Lake did not include waiver requests for zoning ordinances and land development regulations that pertain to: land development review, residential lot requirements, lot dimensional requirements, multifamily dwellings, yard exceptions, frontage on corner lots, vision clearance at corners, frontage setbacks, cul-de-sacs, drainage calculations, stormwater best management practices, aquifer overlay zones, and soil and sediment control plans.

Similar to the town's contention about the Pascoag project, the town also alleges that Crystal Lake's letter describing eligibility for state or federal subsidies "contained only a reference to the project and made no indication that the applicant for this project is Crystal Lake," in contravention of § 45–53–6(f)(1)(i)(D). The town further argues that Crystal Lake's application did not provide an adequate site development plan as required by § 45–53–6(f)(1)(i)(E). According to the town, the site development plan did not include information about a required sew-

er easement or sewer plans and water lines, inadequately described the plan for condominium units, and proposed an inadequate timetable for project completion. The town also notes that the application did not provide an adequate report on existing and proposed conditions for the surrounding area, nor did it include adequate information on street elevations, traffic patterns, open areas, off-site areas, and off-site wetlands. As in connection with the Pascoag project, the town contends that SHAB's internal review of the Crystal Lake project identified many of the same deficiencies set forth by the town.

SHAB's October 17, 2005 written decision on the Crystal Lake project provided reasons for its finding of substantial completeness. With respect to § 45–53–6(f)(1)(i)(B), SHAB rejected the zoning board's contention that Crystal Lake should have listed additional waivers, variances, and exceptions in its comprehensive permit application. SHAB reasoned that most of the waivers that the zoning board identified involved lot-size requirements that did not apply because Crystal Lake was not proposing new lots. SHAB concluded that Crystal Lake "met its burden of listing sufficiently the relief it requests. It may ultimately be shown that additional relief is required * * *. Nonetheless, the scope of the applicable relief can be refined and resolved fully at the evidentiary hearings" on remand. SHAB also noted that Crystal Lake's statement that "construction is expected to commence in late

2004 and continue at a pace dictated by market conditions" was a "fair and reasonable estimate of its intended construction schedule."

Turning to the letter Crystal Lake received from RIHMFC and § 45–53–6(f)(1)(i)(D), SHAB reasoned that Crystal Lake would be proceeding at its peril and would not be able to move the project forward if it submitted an eligibility letter that applied to a different party. SHAB found that the letter was consistent in form and content with other letters that SHAB had accepted over the last several years and that the letter clearly related to Crystal Lake's proposed project. SHAB next addressed the sufficiency of Crystal Lake's site development plans as related to § 45–53–6(f)(1)(i)(E), noting that the zoning board objected only to the lack of approval for a sewer easement. SHAB reasoned that the zoning board may have raised a legitimate concern about a discrete issue, but that the parties could address it during evidentiary hearings on remand. SHAB therefore determined that the single issue of the sewer easement was not enough to deem Crystal Lake's site development plans incomplete. Finally, at the end of its written decision, SHAB summarized its findings relating to substantial completeness for Crystal Lake in the same manner as it did for the Pascoag project.[16]

As with Pascoag, this Court is again unable to conclude that legally competent evidence exists in the record in light of SHAB's adopted definition for substantial completeness. Most glaringly, the com-

---

**16.** SHAB's Crystal Lake written decision concluded:

"[T]he Zoning Board acknowledged that Crystal Lake provided sufficient information as to seven of the ten elements in § 45–53–6(f)(1)(i)(A–J). These seven stipulated elements alone arguably may be sufficient to deem Crystal Lake's application to be substantially complete. Regardless, Crystal

Lake's Application also contains sufficient information regarding the three disputed items. SHAB is convinced that Crystal Lake placed considerable time and effort into the drafting of its Application. There is ample information to allow the parties to proceed with evidentiary hearings addressing the merits of the Application."

prehensive permit application did not make it clear that Crystal Lake proposed a condominium project. Before this Court, Crystal Lake argues that many of the town's references to needed waivers do not apply to the project because the proposal called for a condominium framework with only one lot. A detailed review of Crystal Lake's application, however, reveals that its submitted materials contained only obscure references to condominiums as of February 13, 2004. The "proposed use" section of Crystal Lake's comprehensive permit application describes the number of housing units, but it makes no reference to condominiums.[17] The comprehensive permit narrative prepared by an engineering firm did not include a reference to condominium units. Nor did the fiscal impact study, or the planning summary report make any such reference. This Court could identify only two instances in which references to condominiums appeared in Crystal Lake's submitted materials. The first was a passing reference to "7 townhouse condominium units" in RIHMFC's letter to Crystal Lake. The second reference appeared in small print on the fifth of eight large planning maps that Crystal Lake submitted. Crystal Lake proposed the construction of 174 housing units on nearly 100 acres of land. The project's status as a condominium complex is undoubtedly a material, important, and essential component of a comprehensive permit application.

SHAB's internal staff review noted other problems with Crystal Lake's application. SHAB's review pointed out that the application did not contain a timetable for completing the project, nor did it include a report on existing conditions relating to street elevations or traffic patterns. The internal review also stated that Crystal Lake submitted a "very brief, general statement" on requested variances, special-use permits, and waivers. Finally, the review noted that the town took issue with sewer-line locations, and that the application did not contain a discussion of off-site open areas or wetlands.

Although SHAB's deliberations on Crystal Lake's application were far less extensive than those on Pascoag's application, it is clear that they were infected by the same flawed interpretation of substantial completeness. At the time of its September 19, 2005 vote, SHAB made no mention, much less a specific finding, concerning the project's status as a single-lot condominium. The October 17, 2005 written decision merely states:

"SHAB agrees with Crystal Lake's assessment of the issue. The developer has met its burden of listing sufficiently the relief that it requests. It may ultimately be shown that additional relief is required, as the Zoning Board contends. Nonetheless, the scope of the applicable relief can be refined and resolved fully at the evidentiary hearings before the Zoning Board."

It is this Court's view, as in the case of Pascoag, that the substance of Crystal Lake's comprehensive permit application as of February 13, 2004, leads to the conclusion that Crystal Lake's application did not include "all parts or elements" that are "material," "important," and "essential."

c. East Avenue

■ The town alleges that East Avenue's application failed to satisfy substan-

---

17. The "grounds for application" section of the comprehensive permit application reflects the eleventh-hour nature of Crystal Lake's submission to the zoning board. In that section, Crystal Lake refers to its proposed pro- ject as being consistent with the local needs of the Town of South Kingstown. The project site for the instant proposal, however, sits within the borders of the Town of Burrillville.

tial completeness for four of the ten factors listed in § 45–53–6(f)(1)(i). The town argues that East Avenue did not include a sufficient list of variances, special-use permits, and waivers as stated in § 45–53–6(f)(1)(i)(B). Specifically, the town contends that East Avenue failed to address the following zoning ordinances and regulations relating to housing development review: minimum lot size and width restrictions, lots containing wetlands, culs-de-sac, drainage calculations, traffic circulation, stormwater best management practices, subdivision and land development fees, land application narratives, and soil erosion and sediment control.

The town also argues that East Avenue failed to satisfy § 45–53–6(f)(1)(i)(C) because it did not provide sufficient evidence of site control. Specifically, the town contends that East Avenue did not submit evidence that it was qualified to do business in Rhode Island. To support this assertion, the town presented to SHAB a certificate of nonexistence for East Avenue Development Realty, LLC, the name that appeared in East Avenue's comprehensive permit application. As such, the town argues that SHAB erroneously accepted unsubstantiated comments from East Avenue that it was qualified to do business in Rhode Island because the certificate of nonexistence demonstrates there was no legally competent evidence in the record to support the contention.

The town further alleges that East Avenue failed to provide evidence of eligibility for state or federal subsidies in violation of § 45–53–6(f)(1)(i)(D). The town alleges that a letter from RIHMFC in East Avenue's application contained a reference to the project but did not name East Avenue as the applicant. Finally, the town contends that East Avenue failed to provide a list of abutters with the application, in violation of § 45–53–6(f)(1)(i)(J). The

town argues that SHAB's finding of substantial completeness without any evidence of an abutters list demonstrates its predisposition to deem the applications substantially complete without competent evidence.

SHAB's October 17, 2005 written decision on the East Avenue project delineated reasoning for its finding of substantial completeness. With respect to the list of requested waivers, variances, and special-use permits under § 45–53–6(f)(1)(i)(B), SHAB's written decision noted that East Avenue's comprehensive permit application included the town zoning ordinance from which it sought relief. SHAB concluded that East Avenue sufficiently identified its requests for relief, and that any disputes about the need for additional relief adequately could be addressed on remand during evidentiary hearings before the town zoning board. SHAB also noted that East Avenue's statement that "construction is expected to commence in late 2004 and continue at a pace dictated by market conditions" was a "fair and reasonable estimate of its intended construction schedule." Turning to the evidence of site control and § 45–53–6(f)(1)(i)(C), SHAB addressed the town's argument that East Avenue's official corporate name listed in its comprehensive permit application did not exist as a corporate entity in Rhode Island. SHAB dismissed the argument as a "red herring," reasoning that the zoning board "has not submitted any credible evidence into the record to prove that the developer is not qualified to do business in Rhode Island."

SHAB next addressed East Avenue's eligibility for a state or federal subsidy and § 45–53–6(f)(1)(i)(D). SHAB employed similar reasoning as it used in the Pascoag and Crystal Lake written decisions, finding that the absence of East Avenue's name from RIHMFC's letter was not a

material issue. SHAB concluded that the letter was consistent in form and content with other letters that SHAB had accepted over the last several years and that the letter clearly related to East Avenue's proposed project. SHAB explained that East Avenue would be proceeding at its peril and would not get its project off the ground if it submitted an eligibility letter that applied to a different party.

With respect to the absence of an abutters list and § 45–53–6(f)(1)(i)(J), SHAB noted that East Avenue said that it did not submit the list with its application so that it could submit a current list when a public hearing was scheduled. SHAB concluded that the lack of the abutters list was not fatal to the determination of substantial completeness for East Avenue's application, reasoning that the list could be submitted properly at the outset of the evidentiary hearings after remand to the zoning board. Finally, at the end of its written decision, SHAB summarized its findings relating to substantial completeness for East Avenue in the same manner as it did for the Pascoag and Crystal Lake projects.[18]

As with Pascoag and Crystal Lake, this Court is unable to conclude that legally competent evidence exists to support SHAB's finding of substantial completeness for the East Avenue project. First and most evidently, East Avenue's application failed to include a list of abutters. Given that § 45–53–6(f)(1)(i)(J) specifically lists an abutters list as one of ten factors in the substantial completeness calculus,

East Avenue's promise to submit the list at a public hearing after February 13, 2004, is of no moment.

The dearth of information in East Avenue's application concerning requested variances and special-use permits under the zoning ordinance, as well as the lack of any requested waivers from subdivision regulations, is also significant. Moreover, detailed plans were not submitted, nor was relief requested, relative to regulations concerning drainage systems, stormwater management practices, or soil erosion and sediment control. East Avenue's requested deferral of the submission of fiscal impact reports and traffic reports until the public hearing stage of the review process is also noteworthy. As the town argued before this Court, the limited amount of information presented by East Avenue made it difficult to understand the project's impact on the town.

Finally, we note that East Avenue's comprehensive permit application, submitted on or about January 22, 2004, listed the owners of the site as Donald P. St. Angelo, Sr. and Richard St. Angelo. The applicant name in the application and its supporting materials appeared as East Avenue Development Realty, LLC. As evidence of site control in the application, East Avenue stated, "See Real Estate Agreement information attached. Applicant is nominee of 'Buyer'." The attached real estate agreements, in turn, named the two Mr. St. Angelos as sellers and Empire Acquisition Group, "or its nominee or assignee" as the buyer. At the time East

---

18. SHAB's East Avenue written decision concluded:

"[T]he Zoning Board acknowledged that East Avenue provided sufficient information as to six of the ten elements in § 45–53–6(f)(1)(i)(A–J). These six stipulated elements alone arguably *may be sufficient* to deem East Avenue's application to be substantially complete. Regardless, East Ave-

nue's Application also contains sufficient information regarding its list of requested relief, evidence of site control and funding eligibility. SHAB is convinced that East Avenue placed considerable time and effort into the drafting of its Application. There is ample information to allow the parties to proceed with evidentiary hearings addressing the merits of the Application."

Avenue submitted its application, however, East Avenue Development Realty, LLC, was not qualified to do business in Rhode Island,[19] and, therefore, could not stand as Empire Acquisition Group's nominee because it did not exist as a corporate entity.

This Court concludes, therefore, as in the cases of Pascoag and Crystal Lake, that a review of East Avenue's comprehensive permit application as of February 13, 2004, did not meet SHAB's definition of substantial completeness—*viz.*, it did not contain "all parts or elements" that are "material," "important," and "essential."

## V

### Conclusion

It is clear to us that the General Assembly unmistakably established a very high bar to the use of comprehensive permit applications by for-profit developers when it imposed the moratorium as of February 13, 2004, a moratorium required expressly for the protection of the public health and welfare. The substantial completeness determination was not intended as a savings clause to grandfather those applicants who were able to meet the deadline by filing an application sufficient only to "g[e]t up to the plate" or "to give the town some idea as to what was being proposed." Such applicants were not entitled to proceed under the pre-moratorium standards; they were, however, entitled to refile their applications when the moratorium terminated.

We are mindful of the difficulties SHAB faced as it struggled to implement an appropriate analysis in the discharge of its statutory duty to determine whether com-

prehensive permit applications filed before February 13, 2004, were substantially complete. It is, moreover, evident to us that many members of SHAB were very experienced in the practicalities of marshaling land development projects through the myriad municipal agencies and boards from which approvals must be obtained. The streamlined process created by the Low and Moderate Income Housing Act, however, was anything but a traditional land development permitting process, particularly as evidenced by the moratorium suspending its use by for-profit developers. It is our opinion that the General Assembly intended to preserve only those applications that, in SHAB's definition, contained all parts or elements that are material, important, and essential. Those applicants whose applications were not substantially complete were not entitled to proceed under the pre-moratorium standards.

Although we grant deference to the definition of substantial completeness SHAB adopted in its written decisions of October 17, 2005, we conclude that SHAB acted arbitrarily and capriciously by misapplying the definition to the three applications under review. We further conclude with respect to all three applications that SHAB's ultimate findings of substantial completeness were not supported by legally competent evidence. Accordingly, we reverse the decisions of the State Housing Appeals Board, to which we remand the papers in the case.

---

**19.** The Office of the Secretary of State of the State of Rhode Island and Providence Plantations issued the certificate of corporate non-existence on July 22, 2004. A subsequent filing in this Court indicates that East Avenue

Development Company, LLC came into legal existence on February 2, 2004. Further, East Avenue's legal name did not match the name it submitted in its comprehensive permit application.